**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-2396

T-MOBILE NORTHEAST LLC,

                Plaintiff - Appellee,

        v.

THE LOUDOUN COUNTY BOARD OF SUPERVISORS,

                Defendant - Appellant.

No. 12-2397

T-MOBILE NORTHEAST LLC,

                Plaintiff - Appellant,

        v.

THE LOUDOUN COUNTY BOARD OF SUPERVISORS,

                Defendant - Appellee.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria.  Gerald Bruce Lee, District Judge.  (1:11-cv-01201-GBL-JFA)

Argued:  December 12, 2013          Decided:  April 3, 2014

Before NIEMEYER, AGEE, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion for the court except as to Part IV.C.1 in part and Part IV.C.2, in which Judge Agee concurred except as to Part IV.C.1 in part and Part IV.C.2. Judge Niemeyer wrote a separate opinion as to Part IV.C.1 in part and Part IV.C.2. Judge Agee wrote a separate opinion concurring in part. Judge Wynn wrote a separate opinion concurring in part and dissenting in part.

---

**ARGUED:** Thomas David Stoner, GREEHAN, TAVES, PANDAK & STONER, PLLC, Chantilly, Virginia, for Appellant/Cross-Appellee. Thomas Scott Thompson, DAVIS WRIGHT TREMAINE, LLP, Washington, D.C., for Appellee/Cross-Appellant. **ON BRIEF:** J. Patrick Taves, Michael W.S. Lockaby, GREEHAN, TAVES, PANDAK & STONER, PLLC, Chantilly, Virginia; John R. Roberts, County Attorney, Ronald J. Brown, Deputy County Attorney, LOUDOUN COUNTY ATTORNEY'S OFFICE, Leesburg, Virginia, for Appellant/Cross-Appellee. Daniel P. Reing, DAVIS WRIGHT TREMAINE, LLP, Washington, D.C., for Appellee/Cross-Appellant.

---

NIEMEYER, Circuit Judge, for the court except as to Part IV.C.1 in part and Part IV.C.2:

In October 2011, the Loudoun County (Virginia) Board of Supervisors denied the applications of T-Mobile Northeast LLC for permits to build two telecommunication towers in Loudoun County -- one disguised as a bell tower, to be located on the property of a church in Sterling (in the eastern part of the county), and one disguised as a silo on a farm in Lovettsville (in the northern part of the county). T-Mobile commenced this action under the Telecommunications Act of 1996, challenging the Board's decisions.

On cross-motions for summary judgment, the district court concluded that the Board improperly denied T-Mobile's application for the silo tower in Lovettsville because the Board relied on the environmental effects of radio frequency emissions -- a statutorily prohibited basis for regulation. Even though the Board had given other valid reasons for its decision, the court issued an injunction requiring the Board to issue the necessary permits for the site, concluding that if it remanded the case, the valid reasons would only become a subterfuge for the invalid environmental reason. The district court affirmed the Board's decision denying permits for the bell tower in Sterling because (1) substantial evidence supported the Board's decision; (2) a denial of the permits would not have the effect

3

of prohibiting T-Mobile from providing personal wireless service to its customers; and (3) the decision was not based on the environmental effects of radio frequency emissions.

On appeal, the Board contends that the illegal reason it gave for denying the application for the silo tower represented the views of only one member of the Board and was not binding on the Board. Moreover, it argues, it gave other valid reasons sufficient to justify denial of T-Mobile's application for the silo tower. On its cross-appeal, T-Mobile contends that neither of the Board's denials were supported by substantial evidence and, with respect to the bell tower, that the Board's decision denied it the ability to fill significant gaps in its wireless coverage and therefore effectively prohibited it from providing personal wireless service, in violation of the Act. It also contends that the Board relied on radio frequency emissions to deny the bell tower application, although not expressly.

For the reasons given herein, we affirm the district court's rulings as to both of the Board's decisions.

I

T-Mobile's business includes the provision of personal wireless service, along with other telecommunications services, in the Washington metropolitan area, including Loudoun County. Its wireless network, like other wireless networks, operates by

4

transmitting radio signals to and from antennas mounted on towers, poles, buildings, or other structures. In order to provide reliable service, it must have multiple antennas arranged in a grid by which to overlap coverage. While T-Mobile currently has 56 wireless telecommunications facilities in Loudoun County, it determined, based upon its engineers' analyses, that it still had substantial gaps in coverage in the areas at issue here. To address the deficiency, T-Mobile identified two locations at which it sought to build new wireless telecommunication facilities: (1) the property surrounding the Christ Our Savior Lutheran Church on Jefferson Drive in Sterling, Virginia (the "Bell Tower Site") and (2) the area surrounding the Stephens family farm in Lovettsville, Virginia (the "Silo Site"). After making arrangements with both the Stephens family and the Church for construction of facilities on their properties, T-Mobile submitted applications to the Loudoun County Board of Supervisors for permits to construct monopole antennas at the sites -- one disguised as a silo and the other as a bell tower.

In order to build on the sites, T-Mobile was required to secure from Loudoun County: (1) a "commission permit," which issues initially from the County Planning Commission and is reviewed by the Board for final approval, and (2) a zoning "special exception," which is granted by the Board. In

5

evaluating both types of applications, the Planning Commission and the Board consider the location and character of the proposed structure to determine whether it is in accord with the Loudoun County Comprehensive Plan (the "Comprehensive Plan" or the "Plan"). Since 1996, the Comprehensive Plan has included a "strategic land use plan for telecommunications facilities" that favors the construction of such facilities on existing structures and requires compatibility with other land uses. The plan requires that proposals for facilities include siting and design elements that "mitigate negative impacts" and satisfy a number of aesthetic criteria. Also, the county's zoning rules require that such facilities be "compatible with development in the vicinity with regard to the setting, color, lighting, topography, materials, and architecture." The plan's overall goal is to ensure that telecommunications facilities "blend with the background."

The Silo Site application

T-Mobile's Silo Site application proposed a monopole hidden in a 125-foot-high farm silo that T-Mobile would construct. When the Planning Commission voiced concerns about the height of the silo, T-Mobile revised its proposal to reduce the height to 100 feet. The Planning Commission then issued a commission permit and recommended approval of the facility, finding that

6

the design was in conformity with the Comprehensive Plan. After T-Mobile submitted the Planning Commission's decision to the Board, the Board held a public hearing in July 2011 on both the commission permit and the special exception. County residents present spoke mostly in opposition to the proposal, mentioning concerns about the silo's aesthetics and the antenna's emission of radio waves. In response to the continuing comments regarding aesthetics at the Board meeting, T-Mobile again revised its proposal, reducing the proposed height of the silo to 90 feet.

The Board conducted a business meeting on October 17, 2011, to vote on the Silo Site application. During the meeting, the Board members (Supervisors) discussed reasons for rejecting the application, including aesthetic concerns and the availability of other potential sites. Supervisor Miller also requested, in response to the numerous comments of citizens, that the Board include the "negative environmental impact" from radio frequency emissions as a reason in the pending motion for denying T-Mobile's application. The Board accepted Miller's suggestion to amend the pending motion and then voted 7 to 2 to carry the motion. As required by the Telecommunications Act, the Board issued a written notice of its decision. It gave four reasons for denying the special exception: (1) the proposed design did not mitigate the silo's significant structural presence, thus

7

creating "an unnecessary visual impact on surrounding properties"; (2) the proposed silo height of 90 feet did not "blend with the . . . surrounding area"; (3) a denial of the application would not "have the effect of prohibiting the provision of personal wireless services in this area"; and (4) the facility would have a "negative environmental impact." And it gave two reasons for denying the commission permit: (1) the project was not consistent with the strategic land use plan; and (2) other preferred locations were available to T-Mobile.

The Bell Tower Site application

T-Mobile's original application for a telecommunications facility on the Church property included a proposal to construct an 80-foot flagpole that would house the antenna. When the Planning Commission rejected that proposal, T-Mobile amended it to propose instead an 80-foot bell tower to house the antenna. During the ensuing review process, T-Mobile made a number of additional changes in design, such as varying the color scheme of the structure to better blend with the background. It also offered alternative designs, such as a steeple or tree pole. After a lengthy give-and-take process, the Planning Commission issued the commission permit and recommended approval of the facility.

8

The Board held its public hearing on the Bell Tower Site application on September 12, 2011, and citizens raised a number of concerns with the project, primarily aesthetic, referring to the proposed facility's visual impact. As with the Silo Site, some citizens also raised concerns over the possible negative health impacts of radio frequency emissions.

The Board conducted a business meeting on the Bell Tower Site application on October 4, 2011, and, following a brief discussion, voted to reject it. The Board's written notice of decision gave as reasons that the proposed facility (1) was not at a preferred location; (2) was not on an existing structure; (3) was in a residential area; and (4) did not mitigate the impact on adjacent residential uses. The Board did not refer to the citizens' concerns over radio frequency emissions and gave no indication that it relied on such concerns to deny the application.

Following the Board's rejection of its applications, T-Mobile commenced this action, alleging that the Board overstepped several limitations imposed on it by the Telecommunications Act of 1996. With respect to the Silo Site, T-Mobile alleged that the Board's denial was not supported by substantial evidence and was made on the basis of the environmental effects of radio frequency emissions. And with respect to the Bell Tower Site, it alleged that the Board's

9

rejection was not supported by substantial evidence, caused an effective prohibition of service, and was made on the basis of radio frequency emissions.

On the parties' cross-motions for summary judgment, the district court entered judgment in favor of T-Mobile on the Silo Site, concluding that although the Board's rejection was supported by substantial evidence, the Board improperly relied on the environmental effects of radio frequency emissions. The court entered an injunction directing the Board to issue the necessary permits to T-Mobile for construction of the Silo Site tower. And, as to the Bell Tower Site, the court entered judgment in favor of the Board, rejecting each of T-Mobile's arguments. T-Mobile Northeast LLC v. Loudoun Cnty. Bd. of Supervisors, 903 F. Supp. 2d 385 (E.D. Va. 2012).

From the district court's judgment dated July 20, 2012, the Board filed an appeal challenging the court's decision on the Silo Site, and T-Mobile filed a cross-appeal challenging the court's affirmance of the Board's decision on the Bell Tower Site, as well as its conclusion that the Board's decision on the Silo Site was supported by substantial evidence.

II

The Telecommunications Act of 1996 was enacted "[t]o promote competition and reduce regulation in order to secure

10

lower prices and higher quality services for American telecommunication consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996). As part of the Act, Congress divided authority over personal wireless service facilities, preserving generally to state and local governments their traditional zoning control over the placement, construction, and modification of such facilities while, at the same time, limiting state and local governments' ability "to frustrate the Act's national purpose of facilitating the growth of wireless telecommunications." 360° Commc'ns Co. of Charlottesville v. Bd. of Supervisors of Albemarle Cnty., 211 F.3d 79, 86 (4th Cir. 2000); see also City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115 (2005) (noting that the Act "reduc[ed] . . . the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers"). Specifically, the Act provides that in regulating the siting and construction of wireless facilities, a state or local government (1) may not "unreasonably discriminate among providers"; (2) may not effectively prohibit "the provision of personal wireless services"; (3) must act on a request to place, construct, or modify such facilities "within a reasonable period of time"; (4) must render its decisions "in writing" and with the support of "substantial evidence contained in a written

11

record"; and (5) may not regulate the placement, construction or modification of such facilities "on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [FCC's] regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B). State and local governments must comply with each of these provisions when regulating wireless facilities.

The Act provides that anyone "adversely affected" by a final decision of a state or local government under § 332(c)(7) may commence an action "in any court of competent jurisdiction," which must hear and decide the action "on an expedited basis." 47 U.S.C. § 332(c)(7)(B)(v). When such action challenges whether the state or local government's decision was supported by "substantial evidence," see id. § 332(c)(7)(B)(iii), the court defers to the state or local government, upholding its decision if it has "substantial support in the record as a whole even if [the court] might have decided differently as an original matter." New Cingular Wireless PCS, LLC v. Fairfax Cnty. Bd. of Supervisors, 674 F.3d 270, 274 (4th Cir. 2012) (quoting AT&T Wireless PCS, Inc. v. City Council of Va. Beach, 155 F.3d 423, 430 (4th Cir. 1998) (internal quotation marks omitted)); see also AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment, 172 F.3d 307, 314 (4th Cir. 1999). On the other hand, if the action alleges that the state or local

12

government violated any of the other statutory limitations on its regulatory authority, the court decides the issue de novo. See 47 U.S.C. § 332(c)(7)(B)(v); see also Second Generation Props., L.P. v. Town of Pelham, 313 F.3d 620, 629 (1st Cir. 2002) ("Unlike the substantial evidence issue, the issue of whether [a board] has prohibited or effectively prohibited the provision of wireless services is determined de novo by the district court"); VoiceStream Minneapolis, Inc. v. St. Croix Cnty., 342 F.3d 818, 833 n.6 (7th Cir. 2003) (applying same standard).

With these principles in hand, we turn to the issues raised by the parties on appeal.

III

The Board contends on appeal that the district court erred in ordering it to grant T-Mobile permits to construct the facility at the Silo Site in Lovettsville on the basis that the Board illegally relied on the environmental effects of radio frequency emissions. See 47 U.S.C. § 332(c)(7)(B)(iv). The Board argues that this reason, albeit illegal, was given by only one Board member and therefore was "not binding on the Board as a whole." The Board also argues that even if this reason were binding on it, its decision to deny the application was also based on valid reasons that were sufficient to deny the

13

application, and that therefore the court's injunction was simply punishment for the inclusion of an illegal reason.

At its October 17, 2011 meeting, the Board rejected T-Mobile's application for the Silo Site, citing the silo's "significant structural presence" and related aesthetic complaints. At the suggestion of Supervisor Miller, the Board also included as a reason for rejection the antenna's "negative environmental impact." As Supervisor Miller explained, "We've had speaker after speaker come in here and talk to us about their concerns of being exposed to radiation from an evolving, dynamic technology." With particular relevance to the issue before us, in proposing his amendment, Supervisor Miller told the Board that it was made "notwithstanding the prohibition on what I'm going to propose [i]n the Telecommunications Act of 1996."

Although the district court concluded that the aesthetic reasons the Board gave for denying T-Mobile's application were supported by substantial evidence, it also concluded that the Board nonetheless impermissibly relied, "at least in part," on the environmental effects of radio frequency emissions. The court noted that Supervisor Miller

> even commented that the Board and other local governing bodies deny wireless facility applications on the prohibited basis of environmental impact but cite permissible reasons as subterfuge for their true concerns. Despite Supervisor Miller's admission to

14

> violating federal law, the Board finally adopted his proposed amendment by a 7-to-2 vote.

Loudoun Cnty., 903 F. Supp. 2d at 409 (citation omitted). The court refused to rule that the valid reasons given by the Board to deny T-Mobile's application should allow it to overlook the invalid reason because the Board's decision to include the illegal reason was deliberate, and any remand to allow the Board to reform its reasons would only contribute to the Board's subterfuge:

> The evidence before the Court urges the conclusion that a remand would result in the Board simply justifying denial of the Stephens Silo application by citing the same permissible reasons listed in the written decision challenged in this action. The Court is not satisfied that this decision would be valid under the Telecommunications Act, particularly in light of Supervisor Miller's comment that the Board falsely cites lawful reasons as pretexts for unlawfully denying permit applications and the Board's silent approval of Supervisor Miller's proposal. A remand would simply invite the Board to violate the § 332(c)(7)(B) again while concealing its violation with false justifications for denying T-Mobile's application.

Loudoun Cnty., 903 F. Supp. 2d at 412. In support of its holding, the court also noted that the record contained substantial evidence to support approval of the application, pointing to the County Planning Commission's recommendation that the Board approve the proposed facility based on its staff's finding that "the interior location and stealth design of the proposed facility were in conformance with the Comprehensive

15

Plan and sensitive to the surrounding rural agricultural landscape." Id. at 411 (internal quotation marks omitted).

Based on our review of the record, we conclude that the district court correctly held that the Board's basis for its decision violated the prohibition against regulating on the basis of radio frequency emissions.

First, the record shows that Supervisor Miller's comments during the Board meeting were not isolated, either from the evidence before the Board or from the Board's own views. The record shows that discussions of health concerns were prevalent throughout the several hearings. On July 11, 2011, the Board questioned a representative of T-Mobile about the transmission wattage of the antenna at the Silo Site and whether the signal would be "optimized" in such a way that would increase the radiation exposure level. At the same hearing, a citizen testified that her two boys and "other children . . . [would] be affected by the electromagnetic radiation." And in light of these comments about "health and safety," a T-Mobile employee offered to address the safety concerns of the citizens.

Again at a September 21, 2011 hearing to discuss the application, Supervisor York stated:

> But I do have a question because I hear we are concerned about the radio waves and the possibility of health issues, which I don't even think we have the ability to consider under FCC rules. But having give[n] that, now I am hearing the limit to three

16

users [on the proposed monopole].   Are there more radio wave impacts for health issues with each user on a tower?   In other words, if you limit to one, is it different than if you have five users on a tower or is it the same no matter what?

A T-Mobile representative responded that there would be some increase in radio frequency emissions with an increase in the number of telecommunications providers using the tower but that the increase would not present a health risk.

Finally, at the October 17, 2011 Board meeting, Supervisor Miller successfully requested that radio frequency emissions be given as a reason for denying the permits.  As he explained:

> We've had speaker after speaker come in here and talk to us about their concerns of being exposed to radiation from an evolving, dynamic technology.
>
> *     *     *
>
> Unless these applications are going to be reviewed and voted on by the Congress of the United States, they have done the opposite of occupy the field by depriving the level of government that does have to review and vote on these applications the right to consider something that our direct constituents have asked us to look at.  Governments at our level all over the country do the same thing when they decide that's the reason to turn down one of these applications:  They lie.  They give a reason that's on the legal list when that's not what's on their mind.
>
> I want this decided in a court of law that will be asked the question, Do we have the right to look at something that Congress closed its eyes to 15 years ago and in the context of an evolving technology where frequencies change, power levels change, radiation patterns change, and studies have been made available since the decision was made that there are risks to being exposed this close.

17

When Supervisor Miller made a motion to include the health effects of radiation as a reason for denying T-Mobile's application, the Board added the reason to the motion to deny the application and voted 7 to 2 to carry the motion. The written denial given by the Board specifically included the health risk reason.

Based on this record, it is thus indisputable that the Board as a whole regulated on the basis of radio frequency emissions, a prohibited basis under the Act. See 47 U.S.C. § 332(c)(7)(B)(iv). This explicit statutory prohibition against regulating the placement, construction, and modification of wireless facilities "on the basis of the environmental effects of radio frequency emissions" is a limitation imposed by the Act on the Board's authority. And the fact that the Board relied on valid reasons to support its decision does not immunize its violation of a statutory limitation. As noted by the Supreme Court, each subsection in § 332(c)(7)(B) is a "specific limitation[] on the traditional authority of state and local governments to regulate the placement, construction, and modification of [wireless] facilities." City of Ranchos Palos Verdes, 544 U.S. at 115 (2005). We thus conclude that the fact that the Board gave valid reasons for its decision, which by themselves would be sufficient, does not immunize it from its violation of the statutory limitation.

18

We also agree with the district court that in the circumstances presented -- where radio frequency emissions were a genuine and substantial concern of the Board and where the County Planning Commission, when considering factors other than radio frequency emissions, found the Silo Site application in compliance with the existing criteria for evaluating such applications -- the matter should not be remanded to the Board. The district court properly interpreted the record in concluding that while the Board would, on remand, omit its concerns over radiation when giving reasons for denial of the application, the radiation concerns would nonetheless persist as part of the decisionmaking process. To reject the district court's conclusions in the circumstances presented in this case would mock Congress's prohibition against the use of radio frequency emissions as a basis for regulating wireless facilities when those emissions were in compliance with FCC regulations. See 47 U.S.C. § 332(c)(7)(B)(iv).

The Board devotes a substantial portion of its brief on appeal to noting that it gave legitimate reasons for denying T-Mobile's Planning Commission permit and that only its denial of the special exception included improper environmental health concerns. It thus argues that the environmental reasons had no effect on the ultimate decision because T-Mobile would have been ineligible to obtain a special exception without first obtaining

19

a commission permit. Yet the Board did not reject the special exception on the basis that T-Mobile was ineligible for one.

While the Board's technical description of its procedure may be accurate, the district court correctly concluded that the Board denied T-Mobile's application in one regulatory action. It conducted its hearings on both the permit and the special exception simultaneously, receiving the comments of citizens in connection with both; it addressed one motion when articulating the reasons for denying T-Mobile's application; and it issued one decision for both, even though it did, in its written notice of that decision, separate the reasons for denying the permit and the special exception. That formality, however, did not change the fact that the Board was regulating T-Mobile's placement of the antenna at the Silo Site on the basis of the environmental effects of radio frequency emissions.

The Telecommunications Act does not limit particularized local procedural mechanisms; it limits all local regulatory authority, providing that "[n]o State or local government . . . may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions," by whatever means. 47 U.S.C. § 332(c)(7)(B)(iv) (emphasis added). Thus, in this case, regardless of the mechanism employed, the Board regulated the placement of T-Mobile's proposed facility based on

20

radio frequency emissions, and its argument assigning reasons to one mechanism for denial and not the other does not justify its violation of the limitation.

Because we affirm the district court's injunction directing the Board to grant the necessary permits for the Silo Site, we need not address T-Mobile's arguments challenging the sufficiency of the other evidence given by the Board for its rejection of T-Mobile's application.

IV

On its cross-appeal, T-Mobile contends that the district court erred in affirming the Board's denial of its application to construct a wireless facility at the Bell Tower Site. It argues (1) that the Board's decision was not supported by substantial evidence, as required by 47 U.S.C. § 332(c)(7)(B)(iii); (2) that the decision effectively prohibited T-Mobile from providing its customers with personal wireless service, in violation of § 332(c)(7)(B)(i)(II); and (3) that the decision was made "on the basis of the environmental effects of radio frequency emissions," in violation of § 332(c)(7)(B)(iv). Before we address these arguments, however, we address the Board's contention that T-Mobile did not have Article III standing to challenge in court the Board's decision on the Bell Tower Site.

A

The Board's standing argument is based on its contention that T-Mobile did not have any property interest in the Bell Tower Site to vindicate. See Warth v. Seldin, 422 U.S. 490, 498 (1975) (holding that to have Article III standing, the plaintiff must have "a personal stake in the outcome of the controversy"); see also Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (noting that standing requires a plaintiff to have suffered an injury that "will be redressed by a favorable decision"). The Board's position rests on the fact that T-Mobile's original written agreement with the Church covered the placement of a flagpole on its property, which the Planning Commission rejected, and that the Church and T-Mobile never modified the agreement to give T-Mobile a right to place a bell tower on the property, as ultimately proposed. The Board argues that even if the court were to find that the Board's decision denying the Bell Tower application was unlawful and subsequently were to grant T-Mobile injunctive relief, T-Mobile would still not be able to build its facility without the consent of the Church. Accordingly, the Board concludes, the court had no ability to redress T-Mobile's injuries, as required for standing.

The Board's argument, however, is based on an overly restrictive view of the interests that T-Mobile sought to

22

vindicate in court. While the written agreement with the Church did indeed anticipate an antenna disguised as a flagpole, it also anticipated revisions to the plan. Moreover, the Church agreed to cooperate with T-Mobile in the development of any revised plan and did so throughout the application process. When T-Mobile first proposed a bell tower, in lieu of a flagpole, a representative of the Church sent an email indicating that they "like[d] the idea of a bell tower." Similarly, when further refinements of the proposal were forwarded to the Church, the representative indicated that "it looks good to us." Representatives of the Church also attended Planning Commission meetings in support of T-Mobile's Bell Tower Site application, and the officially designated representative of the Church, who had conducted the negotiations with T-Mobile, later submitted an affidavit stating that "the current design of the proposed wireless facility, which the Church has approved, is a freestanding structure with the appearance of a bell tower." (Emphasis added).

T-Mobile expended substantial time and money in pursuing the Bell Tower Site application, and it certainly would not have done so if it had any reason to believe that it could not have benefited from the effort. We conclude that it had a sufficient interest in the Bell Tower Site and in the outcome of its permit

application process to give it standing to challenge in court the Board's denial of its application.

                                B

On the merits of T-Mobile's challenge of the Board's Bell Tower decision, T-Mobile argues first that the Board did not have substantial evidence in the record to support its decision, thus violating § 332(c)(7)(B)(iii). We disagree.

The record contains the testimony of numerous citizens in the community, as well as citizen petitions and emails, stating their strong opposition to the construction of the Bell Tower facility. The residents noted that the tower would be out of proportion with the surrounding natural environment; that it would diminish the value of their properties; and that the machinery used to support the operation of the tower, such as generators, would introduce unwanted noise. These concerns constituted a legitimate basis for the Board's denial of the application. See New Cingular Wireless, 674 F.3d at 274 ("[A] proposed telecommunication facility's negative impact on the neighborhood may support a finding of substantial evidence" (internal quotation marks omitted)); City Council of Virginia Beach, 155 F.3d at 427 (upholding rejection based on "preserving the character of the neighborhood and avoiding aesthetic blight").

T-Mobile contends, however, that these aesthetic considerations were not legitimate in this case because existing zoning at the site already authorized the Church to construct a bell tower for its own use up to a height of 74 feet. It argues that because the county's zoning rules would accept the visual impact of a similar bell tower without a telecommunications antenna within it, it was not legitimate to reject T-Mobile's bell tower based on visual impact. But the fact that the Church would not need a special exception to construct a similar bell tower without a telecommunications facility in it does not imply that citizens may not have legitimate objections to such a tower. Moreover, T-Mobile fails to recognize that any zoning decision reflects a balance between the benefit provided by the facility and the aesthetic harm caused, and thus a local government might be willing to tolerate what is aesthetically displeasing for one type of use but not for another.

The district court did not err in concluding that the Board's aesthetic reasons had "substantial support in the record as a whole." New Cingular Wireless, 674 F.3d at 275.

C

1

T-Mobile next argues that the Board's denial of its Bell Tower Site application had the effect of prohibiting it from providing personal wireless service, in violation of §

25

332(c)(7)(B)(i)(II) ("The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services"). The district court rejected T-Mobile's argument because T-Mobile failed to carry its burden of showing "an effective absence of coverage," failed to demonstrate a "lack of reasonable alternative sites," and failed to show that further efforts for alternative sites would be "fruitless."

To show that a local government regulation or decision "prohibit[s]" service or has "the effect of prohibiting" service, the telecommunications provider may demonstrate that the regulation calls for the rejection of all wireless facilities -- i.e., that "a local governing body has a general policy that effectively guarantees rejection of all wireless facility applications." T-Mobile Northeast LLC v. Fairfax Cnty. Bd. of Supervisors, 672 F.3d 259, 266 (4th Cir. 2012). Or, if the local government rejects a facility at a single site, the telecommunications provider may demonstrate that the rejection was "tantamount to a general prohibition of service." Id. (internal quotation marks omitted). To make that showing, the telecommunications provider must demonstrate (1) that there is an "effective absence of coverage" in the area surrounding the

26

proposed facility, and (2) that there is a "lack of reasonable alternative sites to provide coverage" or that "further reasonable efforts to gain approval for alternative facilities would be 'fruitless.'" Id. at 268 (citing Albemarle Cnty., 211 F.3d at 87-88). This burden is "substantial and is particularly heavy when . . . the [telecommunications provider] already provides some level of wireless service to the area." Id.

The "effective absence of coverage" does not mean a total absence; it may mean coverage containing significant gaps. See Albemarle Cnty., 211 F.3d at 87-88. This cannot, however, be defined metrically by simply looking at the geographic percentage of coverage or the percentage of dropped calls. It is a contextual term that must take into consideration the purposes of the Telecommunications Act itself. See City of Rancho Palos Verdes, 544 U.S. at 115. The Telecommunications Act announces that among its purposes are the goals of "promot[ing] competition"; "secur[ing] . . . higher quality services for American telecommunications consumers"; and "encourag[ing] the rapid deployment of new telecommunications technologies." Pub. Law. No. 104-104, 110 Stat. 56, 56 (1996). We should therefore not read § 332(c)(7) to frustrate these goals. See City of Rancho Palos Verdes, 544 U.S. at 115. While § 332(c)(7)(A) preserves state and local authorities' traditional authority to regulate the design and siting of

27

wireless facilities, the express limitations of § 332(c)(7)(B) promote the purposes of securing higher quality wireless services and encouraging new technology.  See also City of Rancho Palos Verdes, 544 U.S. at 115.

The technology of 10 years ago may have only supported wireless service that had substantial gaps in coverage and high dropped call rates.  But the technology of today supports increased wireless coverage with reduced rates of dropped calls. On this trajectory, the technology of tomorrow may support 100% coverage with no dropped calls, and the focus may instead be on subtler issues about the nature and strength of signals for particular uses.  The Telecommunications Act clearly intends to encourage this technological development and, to that end, to protect such development from interference from state and local governments when approving the design and location of facilities.  This is manifested in § 332(c)(7)(B).  Thus, in construing the level of service protected by § 332(c)(7)(B)(i)(II), we must take a contextual approach and cannot rely on any specific formula.  See Fairfax Cnty., 672 F.3d at 267 (observing that "reviewing courts should not be constrained by any specific formulation, but should conduct a fact-based analysis of the record, as contemplated by the Act").

28

Even though we affirm the Board's decision on the ground that T-Mobile failed to show that there was a lack of alternative sites from which to provide coverage or that further efforts to gain approval for alternative facilities would be fruitless -- as we explain below -- we nonetheless also address T-Mobile's effort to establish an effective absence of coverage at the Bell Tower Site. This issue is one that was at the core of the parties' arguments and, even with our affirmance on the basis of the alternative-sites issue, the issue of effective coverage remains open as T-Mobile makes efforts to pursue facilities at alternative sites in the same area and again attempts to demonstrate an effective absence of coverage.

In this case, T-Mobile provided evidence that it had a dropped call rate of 1.82% in the area of the Bell Tower Site and an access failure rate of 2.8% in buildings within that area. The district court, noting that "[t]he Fourth Circuit Court of Appeals has not directly resolved the question of precisely what minimum level of wireless service is adequate under subparagraph B(i)(II)," relied primarily on these dropped-call rates in holding that T-Mobile failed to meet its burden of demonstrating a question of fact as to its absence of coverage. But providing coverage may be more than simply ensuring low dropped-call rates. T-Mobile also provided evidence from

"advanced computer propagation modeling" and "actual drive test data" of what its expert called a "significant gap" in in-building coverage in the area of the Bell Tower Site, an area consisting of "approximately 1.4 square miles," in which there are "approximately 10,536 residents." Its expert testified that this level of signal strength effectively prohibited it from providing "acceptable" personal wireless service inside of buildings. The expert witness testified that consumers demand to be able to reliably make and maintain wireless calls, and in some cases, to access wireless data service, within their homes and offices and that if T-Mobile lacks sufficient signal strength to reliably provide service in buildings, it is not, from a consumer's perspective, providing service.

In contrast, the Board's expert conducted a separate computer propagation modeling study, using different methods than T-Mobile, and found fewer gaps in service than T-Mobile did. We are not in a position to assess the relative merits of those studies here, but the Board's expert acknowledged that "if you accept T-Mobile's definition of reliable and if you accept their methodology at arriving at their definitions of signal strength threshold, then . . . there are areas around . . . the Church site, that do not have reliable in-building service at some locations at some time." When asked directly whether she disagreed with T-Mobile's conclusion that it was unable to

30

provide reliable in-building service around the Church site, the Board's expert witness responded, "I think that is an open question."

We conclude that this evidence is sufficient to create at least a factual question about the effective absence of coverage at the Bell Tower Site and therefore that the district court should not have resolved that question against T-Mobile as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).

3

As we have already indicated, T-Mobile failed to satisfy the second prong for showing an effective absence of coverage at a particular site -- that is, it failed to show that there was a lack of reasonable alternative sites from which to provide coverage or that "further reasonable efforts to gain approval for alternative facilities would have been fruitless." Fairfax Cnty., 672 F.3d at 266.

T-Mobile claimed that any alternative sites were inadequate because they were not of sufficient height. But it conceded that constructing multiple antennas at reduced heights would "provide some improvement of coverage . . . within their respective areas." The Board's expert witness went further and identified numerous other sites capable of providing the enhancement of service desired by T-Mobile, including both new

31

and existing structures.  And she asserted that antennas at a combination of two sites -- one to the northeast of the Bell Tower Site and another to the southwest of the Site -- would provide better service than one alone at the Bell Tower Site. While T-Mobile did dispute the efficacy of many of the alternative sites separately, it failed to show that the alternative sites would, in the aggregate, not provide sufficient coverage.

The district court also determined that T-Mobile failed to show that attempting to place its wireless facilities at alternative sites would have been "fruitless."  We agree.

The Board identified alternative sites that "would not require the construction of free-standing monopoles or towers, but would require the collocation of T-Mobile's wireless facilities on existing buildings, a preferred location under the County's Telecom Plan."  Based on our review of the record, we do not believe that the district court erred in its finding that "T-Mobile [had] cite[d] no provision in the Zoning Ordinance or Comprehensive Plan suggesting that any efforts to collocate wireless facilities on the existing structures . . . would be 'fruitless.'"  T-Mobile, 903 F. Supp. 2d at 402.

We thus conclude that on this record, T-Mobile did not carry its substantial burden of demonstrating that alternative sites were not available to remedy the deficiency in coverage

32

that it had identified. Accordingly, we affirm the district court's conclusion that the Board's denial of the application for the Bell Tower Site did not cause an effective prohibition of service in the area.

D

Finally, T-Mobile contends that the Board made its decision regarding the Bell Tower Site in part on the basis of the environmental effects of radio frequency emissions, in violation of § 332(c)(7)(B)(iv). It argues that the "overwhelming focus of the public comment both explicitly and indirectly centered on the fears of radio frequency emissions" and that "the Board denied the Bell Tower Site based on residents' concerns regarding the health effects of RF emissions, while concealing that reason behind the veil of 'visual impact.'"

The record shows that citizens did voice objections to the Bell Tower Site on the basis of health concerns. But the Act does not prohibit citizens from expressing such concerns; it prohibits the Board's acting on them. See T-Mobile Northeast LLC v. City Council of Newport News, 674 F.3d 380, 390 (4th Cir. 2012). Moreover, the record also shows that citizens objected for other reasons, all of which were legally valid. They worried about reductions in the value of their properties; they pointed out that other local communities prohibited

33

telecommunications towers in residential areas; and they articulated specific aesthetic complaints.

While the record does indicate that one Board member voiced concerns about environmental health effects during the application process, there is no evidence that the Board discussed including health effects as a reason for denying T-Mobile's application. Nor did the Board's written order refer to radio frequency emissions as a reason for its decision. At bottom, unlike the evidence presented in connection with the Silo Site, there is simply no evidence to indicate that the Board relied on radio frequency emissions in reaching its decision on the Bell Tower Site, and T-Mobile's argument can only be speculation. Accordingly, we reject it.

V

In sum, we conclude that the Board's decision to deny T-Mobile's Bell Tower Site application was supported by substantial evidence; did not have the effect of prohibiting the provision of personal wireless services in view of the possibility of other alternatives; and was not made on the basis of health concerns about radio frequency emissions. And as to the Silo Site, we conclude that while the aesthetic concerns that the Board gave for denying T-Mobile's application were supported by substantial evidence, its decision to base the

denial of T-Mobile's application on improper environmental concerns about radio frequency emissions was prohibited by the Act. A remand would not eliminate those concerns from consideration of T-Mobile's application.

Accordingly, the judgment of the district court with respect to both Sites is

AFFIRMED.

AGEE, Circuit Judge, concurring:

I agree that we should affirm the district court's judgment. However, I write separately to underscore that we need not and do not reach and decide one particular issue: whether the district court correctly determined the effective-absence-of-coverage issue.

To affirm the district court's judgment on T-Mobile's effective-prohibition claim, it is enough for us to say that there were reasonable alternative sites and efforts to secure permits for those sites would not have been fruitless. By going further, we "stray into the practice of advisory opinion-making, solving questions that do not actually require answering in order to resolve the matters before [us]." Karsten v. Kaiser Found. Health Plan of Mid-Atl. States, 36 F.3d 8, 11 (4th Cir. 1994). Yet "the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." Flast v. Cohen, 392 U.S. 83, 96 (1968) (quotation marks omitted).

Respectfully, then, I do not join Part IV.C.2 of Judge Niemeyer's opinion or the portion of Part IV.C.1 of his opinion that addresses the effective-absence-of-coverage issue. I

conclude that these sections -- which are not part of the
opinion of the Court -- offer an advisory opinion.[*]

---

[*] Even if those portions were part of the opinion of the
Court, they would still be nothing more than non-binding dicta.
See Pittston Co. v. United States, 199 F.3d 694, 703 (4th Cir.
1999) ("Dictum is [a] statement in a judicial opinion that could
have been deleted without seriously impairing the analytical
foundations of the holding -- that, being peripheral, may not
have received the full and careful consideration of the court
that uttered it." (quotation marks omitted)).

WYNN, Circuit Judge, concurring in part and dissenting in part:

While I otherwise agree with the majority opinion, I cannot agree with Part III or with the portion of Part IV.C.1 that discusses the "effective absence of coverage" aspect of a telecommunications provider's burden. As noted on the cover page of the opinion, Part IV.C.2 does not constitute the opinion of this court. The discussion in Part IV.C.1 regarding effective absence of coverage is, therefore, dicta because we do not decide whether T-Mobile established an effective absence of coverage. Put differently, because we affirm the Board's decision on the ground that T-Mobile failed to show both a lack of alternative sites and that further efforts to gain approval of alternative sites would be fruitless, the discussion pertaining to the effective absence of coverage in Part IV.C.1 is unnecessary to the holding of this case. Therefore, I decline to join Part IV.C.1's dicta regarding effective absence of coverage.

Regarding Part III of the majority opinion, I must dissent because it fails to fully consider the significance of two separate and distinct land use entitlements—the special exception permit and the commission permit. Although the Board of Supervisors ("Board") improperly denied the Stephens Silo special exception permit based on its concerns about radio frequency emissions, the Board provided distinct and valid

38

reasons for denying the Stephens Silo commission permit. Neither the majority nor the district court has sufficiently explained how it is that the improper special exception denial somehow taints the separate and distinct commission permit denial, which alone would have been sufficient to bar T-Mobile from constructing its Stephens Silo project. Because I would reverse the district court's order that the Board grant both permits, I must respectfully dissent from Part III of the majority opinion.

I.

Focusing on the facts that pertain to the Stephens Silo site, T-Mobile wanted to construct a wireless telecommunications facility on a farm in Lovettsville, Loudoun County, Virginia. Loudoun County's land use regulations required two separate land use entitlements before construction: a "commission permit" and a "special exception."

The Board and the Planning Commission make decisions on whether to grant such entitlements. In doing so, they are guided by the policies and regulations in Loudoun County's Comprehensive Plan and Zoning Ordinance.[1] Loudoun County's

_____

[1] The State of Virginia requires "every governing body [to] adopt a comprehensive plan for the territory under its jurisdiction." Va. Code Ann. § 15.2-2223(A). The purpose of a

39

Comprehensive Plan contains a Telecommunications Facilities Plan ("Telecom Plan"), which explains that its overarching goal is "to encourage improvements in telecommunications services while mitigating the impacts on . . . residents, nearby land uses, scenic beauty, and rural heritage." J.A. 314. The Telecom Plan is generally intended to "ensure compatibility of telecommunication facilities with nearby land uses" by requiring collocation of facilities whenever possible, establishing design criteria and removal provisions, and creating a process "by which an applicant can demonstrate their compliance with these policies." J.A. 314–15.

The Telecom Plan contains specific policies designed to mitigate the visual impact that antennas, towers, and monopoles have on the "historic character of the rural . . . areas." J.A. 318. Of note here, "the County prefers locating new antennas on existing towers, monopoles or other tall structures[,]" and "[w]hen existing structures cannot be used, new monopoles or towers should be sited within the right-of-way for overhead

---

comprehensive plan is to "guid[e] and accomplish[] a coordinated, adjusted and harmonious development of the territory" to "best promote the health, safety, morals, order, convenience, prosperity and general welfare of the inhabitants . . . ." Id. A zoning ordinance is a method of implementing the comprehensive plan. Id. § 15.2-2224(B)(4).

40

utility transmission lines where the visual impact of an additional tall structure would be minimal." J.A. 318.

All telecommunication facilities in Loudoun County must meet specified criteria to demonstrate compliance with the Comprehensive Plan. The procedural mechanism for ensuring such compliance is the commission permit, which certifies that the proposed project is "substantially in accord with the adopted Comprehensive Plan." Loudoun Cnty., Va. Zoning Ordinance § 6-1101(A). In some zoning districts, telecommunication facilities are permitted "by right[.]" But in other zoning districts, the Board has determined that telecommunication facilities "have the potential for a deleterious impact upon the health, safety, and welfare of the public[.]" Id. §§ 5-618(B), 6-1301. If a telecommunication facility is proposed in such a zoning district, the proponent must obtain a special exception in addition to a commission permit. Id. § 5-618(B)(2). Proponents of projects that are subject to a special exception must demonstrate compliance with criteria beyond those required for a commission permit. Id. § 5-618(B)(3). Ultimately, whether to grant a special exception is in the Board's discretion. Id. § 6-1301.

The Stephens Silo site, located in the AR-1 district, required a special exception in addition to a commission permit. When the Stephens Silo proposal came before the Board on October

41

17, 2011, the Board voted to overturn the Planning Commission's approval of the commission permit and to deny T-Mobile's application for a special exception.  The Board articulated different reasons for the denials:

Commission Permit

1. The proposed project is not fully consistent with the land use policies of the Revised General Plan and Strategic Land [U]se Plan for Telecommunications Facilities (Telecommunications Plan).  The 1996 Strategic Land Use Plan for Telecommunications Facilities recommends any new commercial telecommunication antennas in the rural areas first locate on existing towers, buildings, or other tall structures within a two (2) mile radius. . . .

2. Currently there are existing agricultural silos within a two (2) mile radius on which to locate telecommunications antennas which are preferred locations as outlined in the Telecommunications Plan.

Special Exception

1. The proposed design and siting has not mitigated its significant structural presence, thus creating an unnecessary visual impact on surrounding properties.

2. The proposed silo height of 90-feet does not blend with the natural and built environment of the surrounding area.  The height and appearance is not in keeping with the silos and other farm structures in the immediate vicinity.

3. A denial does not have the effect of prohibiting the provision of personal wireless services in this area of the County, with current service available from T-Mobile and others. . . .

Supervisor Miller made a friendly amendment to include **negative environmental impact** as the fourth reason for denial of the SPEX 2010-0020.

J.A. 1180–81.

42

II.

Thus, the Board articulated separate and distinct reasons for denying each permit. Regarding the commission permit, the reasons given for its denial are directly related to the rural location policies contained in the Telecom Plan. In denying that permit, the Board did not exercise discretion; rather, it made a finding that T-Mobile's proposal failed to comply with the Comprehensive Plan—a prerequisite to obtaining a commission permit.[2] And because T-Mobile could not construct the facility without first obtaining both permits, the lack of a commission permit would have been sufficient to preclude T-Mobile from building its Stephens Silo project.

The majority opinion dismisses this nuance regarding Loudoun County's permitting procedures as a mere "formality." However, I must agree with the County that T-Mobile could not

---

[2] The majority opinion and the district court find it significant that the Board overturned the Planning Commission's approval of the commission permit. But this fact is unremarkable for two reasons. First, the Zoning Ordinance makes clear that the Board has the authority to overturn decisions of the Planning Commission. Loudoun Cnty., Va. Zoning Ordinance § 6-1104. Second, T-Mobile had justified its decision not to locate its facilities on nearby silos on the bases that the nearby property was in foreclosure and that efforts to negotiate with the owner were "to no avail." J.A. 1511. But the Board knew that the property had emerged from foreclosure, and T-Mobile had made no attempt to negotiate with the new owners. Thus, T-Mobile failed to demonstrate to the Board's satisfaction that it used its best efforts to comply with the Comprehensive Plan's rural location policies.

43

construct its facility without the commission permit and that the denial of the special exception was thus "superfluous." Appellant's Br.at 37. And neither the district court nor the majority opinion has explained how it is that the improper "superfluous" denial tainted or in any way impacted the proper and supported commission permit denial.

In sum, I agree with the majority opinion regarding the Board's denial of the special exception. That denial—based on concerns about radio frequency emissions, which the Telecommunications Act unequivocally places beyond consideration by local governments—was improper. However, I fail to see how that invalid denial necessarily taints the proper denial of the separate, distinct, and additionally required commission permit— especially when the district court held that the County's denial of the commission permit was supported by substantial evidence.[3]

Therefore, I must respectfully dissent from that part of the majority opinion that affirms the district court's order

---

[3] The majority opinion and the district court express concerns regarding the effectiveness of remanding this matter to the Board. However, such concerns are present whenever the Court orders relief, and nothing suggests that Loudoun County would flout an order of this Court. Assuming otherwise at the expense of local procedures places us in the position of substituting our judgment for that of the local planning agency and "sitting as a zoning board of appeals[.]" Pomponio v. Fauquier Cnty. Bd. of Supervisors, 21 F.3d 1319, 1327 (4th Cir. 1994) (en banc) (overruled on other grounds by Quackenbush v. Allstate Ins. Co., 517 U.S. 706 (1996)). The job of making land use decisions is not ours; it belongs solely to local officials.

44

forcing Loudoun County to grant T-Mobile a commission permit for the Stephens Silo site. And because Part IV.C.2 does not constitute the opinion of this court, I also decline to join the portion of Part IV.C.1 that discusses the "effective absence of coverage" aspect of a telecommunications provider's burden.