548

CELLCO PARTNERSHIP d/b/a
Verizon Wireless and CWS
VII, LLC, Plaintiffs,

v.

The BOARD OF SUPERVISORS OF
FAIRFAX COUNTY, VIRGINIA,
Defendant.

No. 1:15–cv–2 (LMB/JFA).

United States District Court,
E.D. Virginia,
Alexandria Division.

Signed Oct. 22, 2015.

Edward Lewis Donohue, Donohue & Stearns PLC, Alexandria, VA, for Plaintiff.

Laura Schempf Gori, Fairfax, VA, for Defendant.

## MEMORANDUM OPINION

LEONIE M. BRINKEMA, District Judge.

Plaintiffs Cellco Partnership d/b/a Verizon Wireless ("Verizon") and CWS VII, LLC ("CWS") (collectively, "plaintiffs") brought this action under the Telecommunications Act of 1996 ("the Act"), alleging that defendant Board of Supervisors of Fairfax County, Virginia ("the Board") violated various provisions of the Act when it denied their applications to build a 120–foot wireless communication facility. They seek an injunction requiring the defendant to approve their applications. The Board contends that its denial of the applications complied with the requirements of the Act. The Board also argues that plaintiffs lack standing to dispute its decision and that plaintiffs are not entitled to injunctive relief.

Before the Court are the parties' cross motions for summary judgment. For the reasons that follow, the Plaintiffs' Motion for Summary Judgment will be denied and the Board's Motion for Summary Judgment will be granted.

## I. BACKGROUND

This civil action concerns the denial of applications by CWS and the Trustees of the Andrew Chapel United Methodist Church ("ACUMC")[1] to build a wireless communications facility on the ACUMC grounds, located at 1301 Trap Road, Vienna, Virginia ("the proposed site").[2] Am. Compl. for Declaratory J. and Inj. [Dkt. No. 11] ("Am. Comp.") ¶¶ 2, 7. Plaintiff CWS is a wireless network infrastructure developer. Id. ¶ 2. On June 28, 2013, CWS and the ACUMC Trustees (collectively, the "Applicants") submitted Special Exception Application No. SE 2013–DR–019 ("SE Application") and 2232 Application No. 2232–DI3–9 ("2232 Application") (collectively, the "Zoning Applications" or "Applications"). Id. ¶ 7; Written Stipulation of Uncontested Facts [Dkt. No. 33] ("Stip.") ¶ 1. Plaintiff Cellco Partnership, a telecommunications company doing business as Verizon Wireless ("Verizon"), was not a party to the Applications, but later expressed its intent to enter into an agreement with CWS to locate an antenna on the proposed site. J.A. at 1245.

The Applicants' SE Application sought approval from the Board to build a 140–foot high wireless telecommunications facility disguised as a bell tower, with antennas and a related 35–foot by 70–foot equipment compound ("the proposed facility") on the proposed site. Stip. ¶ 4. The proposed design would allow for multiple wireless carriers to co-locate on the facility. Id. ¶ 3. The Applicants initially submitted the proposal in June 2013. J.A. at 0691. Fairfax County ("the County") received the initial SE Application on November 26, 2013 and the amended version on February 27, 2014. Id. ¶ 4, 8. The Applicants' accompanying 2232 Application

---

1. The Trustees are not plaintiffs in this civil action.

2. In the written record, the proposed site is referred to as the "Old Ash" site.

sought a determination by the Fairfax County Planning Commission ("Planning Commission") as to whether construction of the proposed facility substantially conformed to the Fairfax County Comprehensive Plan, as required by Va.Code Ann. § 15.2–2232. *Id.* ¶ 5; see *also* Fairfax County Comprehensive Plan, 2013 Edition, Policy Plan, Public Facilities, available at http://www.fairfaxcounty.gov/dpz/comprehensiveplan/policyplan/pubfacilities.pdf ("Comprehensive Plan").[3] The County received the 2232 Application on March 10, 2014. Stip. ¶ 13. The Applicants' Statement of Justification ("Statement"), submitted in April 2014, stated that Verizon and T–Mobile needed the proposed facility to "address both network coverage and capacity requirements" in the area, J.A. at 1228, explaining that the current "service gap" along Route 7 and its surrounding neighborhoods required two new wireless facilities, one to the east and one to the west of Route 7. J.A. at 1235. The Statement also provided that CWS had no current plans to develop the structure to the west and had found no desirable alternatives to the ACUMC site for the location to the east. J.A. at 1236.

The proposed site extends over 7 acres and includes an 18,700 square foot church, a parsonage house, a playground, a surface parking lot, and a stormwater management pond. J.A. at 1348. The church's existing attached bell tower measures approximately 30 feet in height. Stip. ¶ 2. ACUMC operates a nursery school on the premises, and the SE Application also sought approval of a Category 3 Special Exception to allow for the continued operation of the church and the nursery school. *Id.* ¶ 10. The Zoning Applications called for the tower to be located approximately 77 feet from the parking lot, 90 feet from the property line to the northeast, 190 feet from the property line to the southeast, 212 feet from the dwelling unit on that southeast parcel, and 150 feet from the playground. J.A. at 1205.

The proposed site is zoned to the R–1 District (Residential District, One Dwelling Unit/Acre) and is surrounded by other R–1 District properties as well as by a currently undeveloped parcel zoned to the PDH–2 District (Planned Development Housing District, Two Dwelling Units/Acre), and by Colvin Run Elementary School, which is zoned to the R–2 District (Residential District, Two Dwelling Units/Acre). Stip. ¶¶ 6, 11. Five properties listed on the Fairfax County Inventory of Historic Sites—Andrew Chapel United Methodist Church,[4] Vernon Leigh House, Bethel Primitive Baptist Church, Spring Glade, and Andrew Chapel School—are located in the immediate vicinity of the site. J.A. at 1325. The proposed site has been the subject of two previous applications to build telecommunications facilities, J.A. at 1348–49, including a 2002 application by CWS to build a 165–foot tall flagpole monopole, which CWS withdrew after Facilities Planning Branch Staff ("Staff") within

---

**3.** The Comprehensive Plan contains a Policy Plan, which "includes a Public Facilities element that establishes the criteria for Mobile and Land Based Telecommunication Services." Stip. ¶ 16. Conformity with the Comprehensive Plan includes conformity with the criteria of the Telecommunication Services section of the Policy Plan. *Id.* ¶ 17. The Comprehensive Plan provisions applicable to this action are also in the Joint Appendix. *See* J.A. at 1229–33.

**4.** The original Andrew Chapel United Methodist Church was located on this site which now houses St. Athanasius Roman Catholic Church; however, the site is still listed on the registry of historic sites as Andrew Chapel United Methodist Church. J.A. at 0042. The Andrew Chapel Cemetery remains on that site and is directly across the street from the proposed site. *Id.*

the Fairfax County Department of Planning and Zoning ("DPZ") recommended denial due to the monopole's "undesirable visual impact" on the home to the southeast of the lot. J.A. at 1202–03.

The proposed facility bears some similarities to an existing facility at the Dranesville United Methodist Church ("Dranesville Facility"), which is located at 1089 Liberty Meeting Court in Herndon, VA, another R–1 zoned parcel in Fairfax County. Mem. in Opp'n to Pls.' Mot. for Summ. J. [Dkt. No. 73] ("Def.'s Opp'n Br.") at 20. The Board approved an SE Application for that facility in 2011. Mem. of P & A in Supp. of Pls.' Mot. for Summ. J. [Dkt. No. 36] ("Pls.' Summ. J. Br.") at 22. The Dranesville Facility is disguised as a bell tower and stands 120 feet high, *id.* at 2; however, it was originally built to be 100 feet tall and only later was expanded through the "Feature Shown" process, which does not require a public hearing. Def.'s Opp'n Br. at 20. The Dranesville site differs from the proposed site in that it covers 8.11 acres, Stip. ¶ 30,[5] is adjacent to a 29–acre commercial property that houses a driving range and miniature golf course, and the closest historic property is located 1.3 miles from the site. Def.'s Opp'n Br. at 20.

The design of the proposed facility at ACUMC underwent several changes between June 2013 and October 2014, largely in response to concerns voiced by Staff. J.A. at 0011. Most notably, the height of the proposed facility was reduced from 140 feet to 120 feet. Stip. ¶ 5. That lower height reduced the number of potential colocating carriers from five to four. J.A. at 1205. The applicants also reduced the width of all three sides of the tower, increased the space between the concealment panels for the antennas, and removed the flame from the traditional Methodist cross and flame design. Pls.' Summ. J. Br. at 6. During this time period, a group of local residents formed to oppose the proposal, naming themselves the Stop Andrew Chapel Cell Tower Group ("SACCT"). J.A. at 0022.

On October 14, 2014, Staff released its report ("Staff Report") on the Applications in which it recommended that the Planning Commission approve the Applications, concluding that the proposed facility complied with the Comprehensive Plan and the Fairfax County Zoning Ordinance ("Zoning Ordinance"). J.A. at 1185–86. Specifically, the Staff Report found that, "[o]verall, the applicants [had] addressed staff concerns by selecting a location that maximizes the distance to adjacent [residences], reducing the height and width of the telecommunications facility, and incorporating design modifications and proposed landscaping to minimize and mitigate visual impacts." J.A. at 1219. The Staff Report's analysis and recommendations were only those of Staff and did not "reflect the position of the Board." J.A. at 1186.

On October 30, 2014, the Planning Commission held a public hearing on the Zoning Applications. Stip. ¶ 22. At the hearing, the Planning Commission heard testimony from 21 opponents of the proposal, including SACCT representatives, their legal counsel, and a local realtor. J.A. at 0022–0078; Def.'s Summ. J. Br. at 3. The Planning Commission also heard testimony from CWS and Verizon's repre-

---

5. The parties appear to dispute the size of the Dranesville parcel. Defendant's counsel stated at oral argument that the Dranesville Facility covers several parcels that together add up to 8.11 acres, while plaintiffs stated that the parcel is just 6.6 acres; however, plaintiffs will be held to the facts to which they stipulated. Those facts state that the Dranesville United Methodist Church "is an 8.11 acre property." Stip. ¶ 30.

sentatives and legal counsel, as well as from members and trustees of ACUMC, some of whom were also local residents, and from Paul Dugan ("Dugan"), a registered professional engineer. J.A. at 0008, 0017–22. At the conclusion of the hearing, the Planning Commission deferred its decision until its November 12 meeting. Stip. ¶ 22. At the November meeting, the Planning Commission unanimously approved the 2232 Application, finding that it substantially conformed to the Comprehensive Plan, and recommended that the Board approve the SE Application. *Id.* ¶¶ 23–24.

On December 2, 2014, the Board held a public hearing on the SE Application. *Id.* ¶ 25. The Board heard testimony from many of the same individuals who had testified at the Planning Commission hearing. Seventeen individuals testified in opposition to the project, Def.'s Summ. J. Br. at 3. Some of these speakers discussed an online petition started by SACCT, which garnered 750 signatures opposing the proposed facility, and also described a survey SACCT conducted in the neighborhoods within .75 miles of the proposed site, which showed that 91% of the local residents surveyed opposed the proposal. J.A. at 1370. During the hearing, John W. Foust, a Supervisor for the Dranesville District, stated that he had received 30 emails in support of the proposed facility, almost all of them from members of ACUMC, and had received 62 emails opposing the proposal. J.A. at 1419.

Following this hearing, the Board voted 8–1 to reject the SE Application and to overturn the Planning Commission's approval of the 2232 Application, pursuant to Va.Code Ann. § 15.2–2232(B). Stip. ¶ 26. The Board cited as its primary concern the adverse visual impact on the adjacent residential area and public way, due to the proposed facility's height and lack of ade-

quate screening, J.A. at 1424–25, and referenced the Comprehensive Plan's emphasis on siting facilities to allow for future expansion as a concern, because any future increase in the facility's height would "exacerbate the visual impact." J.A. at 1430. The Board also found that that the proposed facility was not harmonious with the use of neighboring residential properties and would negatively impact adjacent historical properties, and determined that Applicants had failed to demonstrate that alternative sites and technologies would not provide adequate coverage. J.A. at 1425–28. On December 23, 2014, the Clerk to the Board issued a letter to the Applicants, informing them of the denial and attaching a verbatim transcript of the Board's denial motion, discussion, and vote. Stip. ¶ 27.

On January 2, 2015, CWS and Verizon filed their original complaint against the Board and Fairfax County alleging various violations of the Telecommunications Act and of state law. *Id.* ¶ 28. The County was subsequently dismissed from the action, and plaintiffs filed a four-count amended complaint against the Board. Agreed Order Dismissing Fairfax Cnty., Va., and Authorizing Pls. to File an Am. Compl. [Dkt. No. 15]. Count I of plaintiffs' amended complaint alleges that the Board violated the Act's requirement that its decision be supported by substantial evidence in a written record, Am. Compl. ¶ 26, Count II alleges that the Board's action prohibited or had the effect of prohibiting Verizon from providing personal wireless services, *id.* ¶ 44–45, Count III alleges that the Board's decision was not "in writing" as required by the Act, *id.* ¶¶ 48–50, and Count IV alleges that the Board's decision was arbitrary and capricious under stale law. *Id.* ¶¶ 52–57. Plaintiffs seek declaratory judgments that the Board's decision on the 2232 and SE Applications violated the Telecommunications Act and was arbitrary and capricious.

*Id.* ¶¶ 58–59. Plaintiffs also request an injunction compelling the Board to approve the Applications. *Id.* ¶ 60.

## II. DISCUSSION

Plaintiffs' Motion for Summary Judgment argues that the Board's denial of their Applications was not "in writing" and was not supported by substantial evidence in the written record and therefore violates 47 U.S.C. § 332(c)(7)(B)(iii). Pls.' Summ. J. Br. at 16. Plaintiffs also assert that the Board's denial prohibits or has the effect of prohibiting Verizon from providing personal wireless services, thereby violating 47 U.S.C. § 332(c)(7)(B)(i)(II). *Id.* at 30. The Board denies these contentions and moves for summary judgment, arguing that neither Verizon nor CWS has standing to bring these claims and that the mandatory injunction sought by plaintiffs would impermissibly invade the Board's legislative discretion. Answer to Am. Compl. for Declaratory J. and Inj. [Dkt. No. 16] ("Answer") ¶¶ 62–64.

### A. *Standard of Review*

Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," *Dulaney v. Packaging Corp. of Am.,* 673 F.3d 323, 324 (4th Cir.2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to merit summary judgment, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Am. Arms Int'l v. Herbert,* 563 F.3d 78, 82 (4th Cir.2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment. *Hooven– Lewis v. Caldera,* 249 F.3d 259, 265 (4th Cir.2001). Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." *Id.*

■ Where the nonmoving party bears the burden of proof, the party moving for summary judgment may prevail by showing "an absence of evidence to support" an essential element of that party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Rhodes v. E.I. du Pont de Nemours & Co.,* 636 F.3d 88, 94 (4th Cir. 2011). Once the moving party has successfully demonstrated that absence, the nonmoving party must "come forward with specific facts," rather than just "metaphysical doubt[s]," that establish that there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks omitted). The failure to do so "renders all other facts immaterial" and entitles the movant to summary judgment as a matter of law. *Rhodes,* 636 F.3d at 94. The court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.,* 57 F.3d 1317, 1323 (4th Cir.1995) (internal quotation marks and citations omitted).

### B. *Standing*

 The Board argues that, regardless of the merits of plaintiffs' claims, neither plaintiff has standing to contest the Board's decision. Mem. in Supp. of Def. Bd. of Supervisors' Mot. for Summ. J. [Dkt. No. 67] ("Def.'s Summ. J. Br.") at 4–7. The "irreducible constitutional minimum of standing" requires that the plaintiffs (1) have suffered "an injury in fact" that invades "a legally protected interest" and is both "concrete and particularized" and "actual or imminent;" (2) that injury is fairly traceable to the defendant's challenged action; and (3) it is "likely, as opposed to merely speculative," that the injury would be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted). When a plaintiff was not the object of the challenged government action or inaction, it is "substantially more difficult" to establish standing. *Id.* at 562, 112 S.Ct. 2130 (quoting *Allen v. Wright,* 468 U.S. 737, 758, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)) (internal quotation marks omitted). A plaintiff must allege "such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Institute,* 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)) (emphasis in original) (internal quotation marks omitted).

 This constitutional minimum required for standing is distinct from the cause of action provided by a federal statute. The Telecommunications Act allows anyone "adversely affected" by a final decision of a state or local government inconsistent with the provisions of § 332(c)(7)(B) to commence an action "in any court of competent jurisdiction," 47 U.S.C. § 332(c)(7)(B)(v). This provision establishes a cause of action under the Act, but contrary to plaintiffs' assertions, a plaintiff's mere allegation that it has been adversely affected is insufficient to establish standing to sue under the Act. *Contra* Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. 1. (Dkt. No. 72) ("Pls.' Opp'n Br.") at 7. Instead, a plaintiff must also establish the elements of constitutional standing to invoke the court's jurisdiction. Although Zoning Ordinance § 9–009 provides that only a property owner, easement owner, condemnor, lessee, contract purchaser, official, department, board or bureau of a government, or condominium can apply for a special exception, the Fourth Circuit has found that a contract and subsequent cooperation between a landholder and a wireless provider to build a telecommunications facility, accompanied by the provider's expenditure of time and money in pursuing a zoning application, was sufficient to confer constitutional standing on the wireless provider. *T–Mobile Ne., LLC v. Loudoun Cnty. Bd. of Supervisors,* 748 F.3d 185, 196–97 (4th Cir.2014) ("*Loudoun Cnty.*").

### 1. *Verizon*

 The Board argues that Verizon lacks standing to bring this action because it has failed to allege or establish injury in fact, causation, or redressability for any of its claims against the Board. Specifically, the Board argues that Verizon does not have a lease or binding agreement regarding the proposed facility and consequently lacks any legally cognizable interest in the outcome of the Zoning Applications. Def.'s Summ. J. Br. at 5–6. The Board cites the "letter of intent" sent by Verizon to CWS as evidence of Verizon's having merely a speculative interest in the Applications. In that letter, Verizon expresses interest in forming a contract with CWS to locate an antenna on the proposed facility

but states that the letter is not contractually binding and does not create a legal obligation. J.A. at 1245. The Board contends that without a legal obligation there is no legally protected interest, and without such an interest there is no causal link fairly traceable between the Board's action and any potential injury to Verizon. Def.'s Summ. J. Br. at 6. The Board also argues that the likelihood that any favorable decision would redress any such injury is merely speculative, because CWS is under no obligation to contract with Verizon even if the Board approves the Applications. *Id.*

Plaintiffs respond that Verizon "expended significant resources supporting the Applications" by working for a year to develop the proposed design, complying with "numerous procedural requirements," and assembling "expert and other reports at the request of the County," and that Verizon would not have done so absent an expectation that it stood to benefit from those efforts. Pls.' Opp'n Br. at 7. Plaintiffs argue that Verizon's purpose in expending those resources was frustrated by the denial of the Zoning Applications, that the Board's frustration of that purpose constituted Verizon's injury, and that a decision reversing the denial will redress that harm. *Id.* Plaintiffs also characterize Verizon as one of the applicants for the zoning permits. Pls.' Summ. J. Br. at 1.

These arguments fail to demonstrate that Verizon has standing to pursue this action. Contrary to plaintiffs' characterization in its later pleadings, the record shows that Verizon was not actually a party to the Applications; rather, CWS and ACUMC were the only applicants. *See* Am. Compl. ¶ 2 ("CWS and the Trustees ... were the Applicants"). For example, the Applicants' Statement of Justification clearly states that "CWS VII, LLC and the Trustees of Andrew Chapel United

Methodist Church ("Applicants") hereby submit this Statement of Justification in support of their application for a Special Exception," J.A. at 1227, and the Staff Report states that "[t]he applicants, CWS VII, LLC and the Trustees of Andrew Chapel United Methodist Church" jointly applied for a 2232 review and special exception. J.A., at 1200. Moreover, the Special Exception Affidavit ("Affidavit") lists CWS, the ACUMC Trustees, and their legal counsel as "all Applicants, Title Owners, Contract Purchasers, and Lessees of the land described in the application" and states that all individuals with such relationships to the application must be disclosed. J.A. at 1251–52. There is no mention of Verizon as a co-applicant anywhere in these materials, and plaintiffs stipulated that CWS and the ACUMC Trustees were the only applicants. Stip. ¶ 4. In fact, Verizon could not have been a party to the SE Application because Verizon was not a "property owner, owner of an easement, possessor of the right of entry under the power of eminent domain, lessee, contract purchaser, official, department, board or agent of any government or their agent, or condominium" as required by Zoning Ordinance § 9–009. Verizon's "letter of intent" is the only evidence of Verizon's potential interest in the site and by its terms does not create a binding contract or other legal interest that would allow Verizon to participate in the application process. J.A. at 1245.

In addition to its September "letter of intent," the evidence in this record of Verizon's involvement in the application process includes a one-page letter to Staff on August 7.2014. The letter states that Verizon was "seeking to improve its wireless services along Route 7," that the proposed site was a "necessary site to improve" coverage and capacity, and that although Verizon engineers had analyzed the location of one potential alternative site and

determined that it would serve Verizon's needs, the proposed site would still be necessary. J.A. at 1243. Verizon did not provide any additional data or analysis by its engineers supporting these assertions. A week later, Verizon sent the Planning Commission a one-page "Statement of Certified Engineer" stating that Verizon had "selected" the proposed site, inaccurately referring to Verizon as "[t]he applicant," and attaching propagation maps. J.A. at 1244. That letter also stated that Verizon had not identified adequate alternative sites and certified that the proposed facility would meet the performance standards of the R–1 District pursuant to Zoning Ordinance § 9–103. *Id.* On October 7, 2014, several weeks before the Planning Commission hearing, Verizon submitted a four-page letter from Dugan addressing the need for the proposed facility and accompanied by propagation maps he produced. J.A. at 0724. Dugan also submitted a two-page summary of his testimony in front of the Planning Commission as "Supplemental RF Information" on November 6, 2014. J.A. at 0734.

These submissions are insufficient to demonstrate constitutional standing. Verizon was not an applicant for the 2232 review or special exception and lacked any contractual or property interest that would have allowed it to be. Additionally, an attachment to the Statement of Justification described how CWS, not Verizon or any other party, "focused on Route 7 and its surrounding neighborhoods" to find a location for a facility and eliminated alternative options. J.A. at 1235–36. Although CWS refers in the Statement to Verizon and T–Mobile's need for a facility at the proposed site, CWS does not state that it was working with Verizon to select the proposed site or develop the proposed design. J.A. at 1228. This evidence directly contradicts Verizon's assertions that it selected the proposed site.

Moreover, Verizon's letters and evidence were submitted to the Board approximately eight months after the application process began, and they provide the only evidence in the record demonstrating time and effort expended by Verizon on the Applications. Verizon's handful of letters to the Board hardly constitute lengthy "reports" and pale in comparison to the extensive PowerPoint presentations prepared by SACCT and the quantity of detailed letters sent by SACCT's counsel to the County over a period of months. *See, e.g.,* J.A. at 0887–119. Although CWS representative Thomas Murray, plaintiffs' counsel, and Dugan submitted PowerPoint presentations to the Board and Planning Commission, it is unclear how much Verizon contributed to those presentations. J.A. at 0666–0721. Furthermore, when SACCT raised concerns that plaintiffs' photo simulations were inaccurate, it was Murray who responded to those contentions in a letter that he signed on behalf of CWS, thereby indicating that CWS was the primary party involved in the Applications. J.A. at 0737–38. When plaintiffs' counsel forwarded that response to the Board, he did so. "[o]n behalf of the applicants, CWS VII, LLC and The Trustees of Andrew Chapel United Methodist Church." J.A. at 0180–74. These submissions consequently show that Verizon was not involved with the Applications from their inception in 2013, and they undercut Verizon's claim that it helped design the proposed facility and helped select the location.

On this record, the Court finds that Verizon was not an applicant, that it lacked any lease agreement or other enforceable legal interest related to the Zoning Applications, and that it did not participate in the bulk of the proposal design and application process. This lack of involvement and of a cognizable legal interest demon-

strates that Verizon could not have suffered a concrete and particularized injury fairly traceable to the Board's actions. Moreover, any such injury would not be redressable by a favorable decision in this civil action, because even if the Court ordered the Board to approve the Applications, it could not order CWS to allow Verizon to locate on the proposed facility absent a legally enforceable contract. Consequently, Verizon has failed to allege a sufficient personal stake in the controversy to establish standing. Because Verizon lacks constitutional standing, it is unnecessary to determine whether Verizon was "adversely affected" under the terms of the Act.

### 2. CWS

■ The Board also argues that CWS lacks standing because although CWS was a co-applicant, CWS does not allege any property interest in the proposed site sufficient to confer constitutional standing. Def.'s Summ. J. Br. at 7. The Board further asserts that CWS was not adversely affected under the terms of the Act because its injury was not proximately caused by a violation of the Act and is simply derivative of ACUMC's injury. Reply in Supp. of the Bd.'s Mot. for Summ. J. [Dkt. No. 76] ("Def.'s Reply Br.") at 7 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* — U.S. ——, 134 S.Ct. 1377, 1390, 188 L.Ed.2d 392 (2014) (discussing whether a plaintiff had a statutory cause of action under the Lanham Act)). Plaintiffs respond that a property interest is not required to establish standing and that cases brought by companies like CWS are routine. Pls.' Summ. J. Br. at 9.

Unlike Verizon, CWS does have a sufficient personal stake in this matter. The Fourth Circuit does not require that a plaintiff possess a property interest to have standing under the Act, but has found that a plaintiff can have standing based on a contract with a landholder and the expenditure of "substantial time and money." *Loudoun Cnty.,* 748 F.3d at 196–97. CWS was clearly one of the two applicants for the proposed facility, Stip. 4, and there is no dispute that ACUMC wishes to lease its property to CWS should the Applications be approved. Additionally, CWS was the primary participant in the design and application processes. The evidence discussed above demonstrating Verizon's lack of involvement also shows that CWS was involved with the proposal and the Applications from the very beginning in 2013. CWS selected ACUMC as the proposed site, J.A. at 1235–36, worked over the course of a year to refine the proposal, J.A. at 0676, submitted revisions in response to Staff concerns and community opposition, J.A. at 0242, conducted a balloon fly and prepared photo simulations, J.A. at 0737–38, made presentations to the community, J.A. at 0242, and otherwise invested time and resources into pursuing the Applications. Therefore, the Board's action caused CWS to suffer concrete injury that is fairly traceable to the denial. A reversal of the denial would consequently redress the harm to CWS. Accordingly, CWS has adequately alleged a sufficient personal stake in the outcome of the proceedings to demonstrate constitutional standing.

■ CWS has also been proximately and sufficiently "adversely affected" to bring a claim under the Act. Although defendant's arguments on this point rely primarily on *Lexmark,* which interpreted the Lanham Act rather than the Telecommunications Act, there is nonetheless no evidence that CWS's injury is merely derivative of ACUMC's or that it was "too remote" from the Board's allegedly unlawful conduct to provide CWS with a cause of action under the Act. *See Lexmark,* 134

S.Ct. at 1390 (internal quotation marks omitted). CWS and ACUMC were equal co-applicants and both stood to benefit financially from the proposed facility. Additionally, the record indicates that CWS expended significantly more time and resources on gaining approval of the Applications than did the ACUMC Trustees. For instance, the letters of intent and interest sent by wireless carriers are addressed to CWS, J.A. at 0671–73, and CWS signed letters to the Board on its own behalf and without reference to ACUMC. J.A. at 0737–38. In tact, it is unclear from the record how much of a role, if any, the ACUMC Trustees took in designing the proposed facility, complying with procedural requirements, and promoting the Applications. Therefore, CWS's injury is sufficiently proximate to the Board's denial of the Applications to make CWS a party "adversely affected" under the Act. Accordingly, CWS has standing to pursue this action.

### C. *Count III: Writing Requirement*

Count III alleges that the Board violated the Act's requirement that any decision by a local government regarding construction of a wireless facility "be in writing," 47 U.S.C. § 332(c)(7)(B)(iii), because the Board dated its written denial December 3, 2014 but did not issue its denial and written reasons until December 23, 2014. Pls.' Opp'n Br. at 21. Plaintiffs argue that such "backdating" to December 3 is inconsistent with the Supreme Court's recent ruling that a locality must provide its reasons "essentially contemporaneously" with the denial to avoid shortening the Act's 30 day statute of limitations for appeal. *Id.* (citing *T–Mobile S., LLC v. City of Roswell, Ga.,* —— U.S. ——, 135 S.Ct. 808, 812, 816, 190 L.Ed.2d 679 (2015)). Plaintiffs contend that to the extent that the backdating set the date of denial as December 3, the Board violated these standards, but

if the denial occurred on December 23, the Board did not. The Board affirmatively states that the date of its denial was December 23, 2014. Def.'s Reply Br. at 13–14. Therefore, there is no factual dispute that the Board provided its reasons "essentially contemporaneously" with its denial.

■■■■ Plaintiffs also initially claimed that the letter and Verbatim Transcript did not suffice as a "writing" because they were "cursory" and did not "articulate the rationale for the Board's denial as required" under the Act. Am. Compl. ¶ 48. Although plaintiffs appear to have conceded this point by failing to discuss it in their summary judgment briefs in any significant way, this alternative argument also fails. The Supreme Court recently explained that the "in writing" requirement ensures that a reviewing court will "be able to identify the reason or reasons why the locality has denied the application." *City of Roswell,* 135 S.Ct. at 814. The Court emphasized that the reasons provided simply need to be "clear enough to enable judicial review" and "need not be elaborate or even sophisticated." *Id.* at 815. Although providing a separate statement explaining the reasons for its decision might be best in terms of avoiding prolonged litigation, a locality does not have to provide its reasons "in any particular format" and "may rely on detailed meeting minutes." *Id.* at 816.

■■■ The Board's denial was issued before *City of Roswell* was decided, but as discussed below, the Verbatim Transcript provided by the Board contained detailed reasoning by both Supervisor Foust and other members of the Board as to why the Board was denying the Applications. *See* J.A. at 1460–65. Plaintiffs' allegation that the writing was insufficient because it contradicted the Planning Commission's

findings conflates the substantial evidence requirement with the "in writing" requirement,[6] and their description of the Board's decision as "cursory" belies the detailed nature of the Board's reasoning.

Because the Board's writing was sufficient to allow this Court to determine the reasons why the Board denied the Applications, plaintiffs have not provided sufficient evidence from which any reasonable juror could find that the Board violated the "in writing requirement," and defendant will be granted summary judgment as to Count III.

### D. Counts I and IV: Substantial Evidence and Arbitrary and Capricious

In Count I, plaintiffs allege that the Board violated the Act's requirement that any decision by a local government to "deny a request to place, construct, or modify personal wireless service facilities" be "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). In Count IV, plaintiffs raise a related claim that the Board's decision was arbitrary and capricious under state law. When an action brought under the Act challenges whether the locality's decision was supported by substantial evi-

dence, the court defers to the government and upholds its decision if there is "substantial support in the record as a whole," even if the court would have decided the issue differently. *Loudoun Cnty.*, 748 F.3d at 192 (citing *New Cingular Wireless PCS, LLC v. Fairfax Cnty. Bd. of Supervisors*, 674 F.3d 270, 274 (4th Cir.2012) (*"New Cingular"*) (internal quotation marks omitted)).

Substantial evidence is more than a mere scintilla but less than a preponderance of the evidence, and means that the Court must determine whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support" the Board's decision, recognizing that the "reasonable mind of a legislator is not necessarily the same as the reasonable mind of a bureaucrat." *AT & T Wireless PCS, Inc. v. City Council of Va. Beach*, 155 F.3d 423, 430 (4th Cir.1998) (internal citations and quotation marks omitted) (*"Va. Beach"*). In the legislative context, the views of constituents may be "particularly compelling forms of evidence" that "if widely shared, will often trump those of bureaucrats or experts." *Id.* Additionally, evidence of a proposed facility's adverse impact on the

---

**6.** Plaintiffs also argue that because the Board's denial did not cite to evidence in the record that either contradicted Dugan's testimony or supported its belief that alternative sites were available, the Board lacked substantial evidence for its decision. Pls.' Opp'n Br. at 12–13. Plaintiffs contend that the Board must explain its reasons for "rejecting or discrediting competent evidence," citing a Third Circuit case that the Board correctly argues is inapposite to the Fourth Circuit's highly deferential standard for substantial evidence. *Id.* at 13 (quoting *Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho–Ho–Kus*, 197 F.3d 64, 71–72 (3d Cir.1999)); Def.'s Reply Br. at 7 (citing *AT & T Wireless PCS, Inc. v. City Council of Va. Beach*, 155 F.3d 423, 430 (4th Cir.1998) (upholding denial of an appli-

cation as based on substantial evidence even though expert testimony and other evidence in the record may have amounted to a preponderance of evidence in favor of the application)).

As discussed above, the Act requires only that the Board provide sufficient reasons in its written denial, not that the Board cite to all the relevant evidence supporting those reasons. *City of Roswell*, 135 S.Ct. at 814–15. There is no additional requirement under *City of Roswell*, Fourth Circuit, or Virginia precedent that the Board also discuss all contrary evidence in issuing its denial. Therefore, this argument fails to show that the Board violated either the "in writing" or "substantial evidence" requirements.

surrounding neighborhood or of an application's inconsistency with the Zoning Ordinance and Comprehensive Plan can constitute substantial evidence that justifies denial of an application, even when the applicant has provided conflicting evidence. *New Cingular*, 674 F.3d at 274.

Under Virginia law, the Planning Commission reviews 2232 Applications to determine their conformity with the Comprehensive Plan, but the Commission's decisions are subject to review by the Board of Supervisors and may be overruled by the Board's majority vote. Va. Code Ann. § 15.2–2232(B). In reviewing a 2232 Application, the Planning Commission and Board must determine whether there is substantial evidence of the proposed facility's compliance with the Comprehensive Plan. Va.Code Ann. § 15.2–2232 (the location, character, and extent of the facility must be "substantially in accord" with the Comprehensive Plan and the Commission's decision on any telecommunications facility must comply with the requirements of the Telecommunications Act).

The Comprehensive Plan directs applicants to avoid constructing new telecommunications structures and to seek instead to locate proposed facilities on existing structures if the facilities can be placed in a way that blends inconspicuously with those structures. Objective 42(a); J.A. at 1229. When existing structures are not available or co-location on such structures is not appropriate, the Plan states that new structures should be built where there is "the greatest opportunity to conceal ... and minimize their visual impact." Objective 42(b); J.A. at 1230. In particular, the Plan requires designing the facility so as to minimize its impact on "the character of the property and surrounding areas," Objective 42(j), especially if they are residential areas. Objective 43; J.A. at 1231,

1233. In that vein, the Plan also requires locating facilities to protect "views of and vistas from architecturally and/or historically significant structures." Objective 42(m); J.A. at 1232.

The Plan calls for designs that mitigate the "visual presence and prominence" of facilities by "concealing their intended purpose in a way that is consistent with the character of the surrounding area." Objective 43; J.A. at 1233. This mitigation can be accomplished through the use of "camouflage structure design and/or micro-cell technologies .... such as distributed antenna systems (DAS)." Objective 42(c); J.A. at 1230. To ensure that concealed facilities remain consistent with the area's character, stealth designs should "resemble other man-made structures and natural features (such as flagpoles, bell towers, and trees) that are typically found in a similar context and belong to the setting where placed," and should "be of a bulk, mass, and height typical of and similar to the feature selected." Objective 43; J.A. at 1233.

Additionally, the Plan expresses a preference for placing new structures on public lands when there are alternative sites providing "similar or equal opportunity to minimize impacts," Objective 42(d), and requires that the height of the proposed facility be "no greater than necessary to allow for co-location while still mitigating the visual impact." Objective 42(h); J.A. at 1230–31. Finally, an applicant must demonstrate that "the selected site provides the best opportunity to minimize its visual impact" and has "the least visual impact on residential areas and the public way, as compared with alternate sites." Objective 42(k); J.A. at 1232.

The Planning Commission also reviews SE Applications and makes a recommendation to the Board as to whether they satisfy the criteria of Article 9 of the Zon-

ing Ordinance, but again only the Board has the authority to make a final decision on those applications. Stip. ¶¶ 19–20. A special exception is required when the proposed use is incompatible with or will have an undue impact on the current uses of land. Zoning Ordinance § 9–001; J.A. at 0809. The Board must deny the application if the special exception use will not be compatible with the surrounding neighborhood or does not comply "with all applicable standards." *Id.*

These standards require that the use "be in harmony with the adopted comprehensive plan" and "with the general purpose and intent of the applicable zoning district regulations." Zoning Ordinance § 9–006(1)–(2); J.A. at 1334. Moreover, the Board must ensure that the use will "be harmonious with and will not adversely affect the use or development of neighboring properties," and that the "location, size, and height" of proposed facilities and "the nature and extent of screening" will be such that the facility "will not hinder or discourage" the use or development of adjacent properties or impair the value of those properties. Zoning Ordinance § 9–006(3). The Zoning Ordinance also requires "landscaping and screening in accordance with . . . Article 13," Zoning Ordinance § 9–006(5), which similarly seeks "to preserve the character of an area by preventing harmful effects of potentially dissimilar uses." Zoning Ordinance § 13–101. An applicant for a special exception or a 2232 review bears the burden of demonstrating compliance with these criteria.

### 1. *Adverse Impact*

█ Plaintiffs contend that the Board's denial was not based on substantial evidence because the Board inappropriately and exclusively focused on the height of the proposed facility in reaching its decision, Pls.' Summ. J. Br. at 18–19, and did not provide any additional reasons for its rejection until its later court filings. Pls.' Reply in Supp. of Their Mot. for Summ. J. [Dkt. No. 75] ("Pls.' Reply Br.") at 3. Plaintiffs point to Supervisor Foust's statement that the "fundamental issue" with the proposed facility was its "visual impact . . . caused by the soaring height of the proposed tower and lack of adequate screening" as evidence that the Board impermissibly rejected the Applications exclusively on the basis of height. Pls.' Summ. J. Br. at 19 (citing J.A. at 1460). Plaintiffs argue that denying the Applications solely because of the proposed facility's height renders the special exception process meaningless and reflects a categorical prohibition on tall wireless facilities that is inconsistent with the Comprehensive Plan. *Id.* at 21.

The Board responds that its decision was not based exclusively on the proposed facility's height but instead on its noncompliance with multiple provisions of the Comprehensive Plan and Zoning Ordinance and that the denial therefore was based on substantial evidence. Def.'s Opp'n Br., at 5. In particular, the Board argues that it based its decision on the proposed facility's "overall negative visual impact," not just on its height. *Id.* at 8. Additionally, the Board contends that the proposed facility's incompatibility with the R–1 District and not its height triggered the need for a special exception and that the Board's denial based on the proposed facility's lack of harmony with the surrounding area and potential for negative impact consequently did not undermine the purpose of the special exception process. *Id.* at 5.

Plaintiffs mischaracterize the quantity and detail of the legitimate reasons given by the Board for its denial. Although Supervisor Foust repeatedly referenced the proposed facility's height, he did so in the context of discussing its "visual impact

as a whole" on the residential area surrounding the proposed site. J.A. at 1424–25. He also cited the proposed facility's proximity to other properties, its impact on nearby historical sites, the availability of alternative sites and technologies, the lack of adequate screening, the lack of resemblance between the proposed facility and adjacent similar structures, and community opposition, particularly concerns that the facility would not enhance the community's existing character. J.A. at 1424–31. Foust tied each of these reasons to specific Comprehensive Plan and Zoning Ordinance provisions and determined that the proposed facility "[did] not comply with these standards and objectives." J.A. at 1423–24. For example, Foust referenced Objective 42(k)'s emphasis on mitigation of visual impact and discussed the adverse impact of a "120–foot tower in an area where most of the existing structures measure last [sic] than 30 feet in height" and where "the sparse vegetation on the church property is approximately 50 to 60 feet tall," referring to the photo simulations that "vividly illustrate the significant adverse visual impact to residents." J.A. at 1424–25. He also stated that Objective 42(c) "encourages us to consider micro cell technology ... if feasible" and that Applicants had "provide[d] insufficient information to back up [their] claim" that DAS was not feasible alone in or combination with alternatives. J.A. at 1427. Additionally, he found that the proposal did not meet Objective 43's directive that "facilities should resemble structures that are typically found in a similar context," and he agreed with residents who "d[id] not consider this proposed use to be harmonious with their properties" and who had "express[ed] legitimate concerns" that the proposed facility would change the character of their neighborhood of "single-family homes, with a lake, trails, and a wooded

area, that backs up to Wolf Trap." J.A. at 1427–28.

These statements, along with the other detailed reasons Foust provided in recommending denial, demonstrate that Foust appropriately analyzed the proposed facility according to the applicable provisions of the Comprehensive Plan and Zoning Ordinance and did so with the correct emphasis on evaluating the proposal in the context of the character of the proposed location. Height is certainly relevant to that evaluation, but Foust's statements show that it was not the Board's exclusive consideration and was instead just one aspect of the Board's context-dependent analysis.

Plaintiffs focus on Foust's statements; however, other members of the Board also articulated reasons beyond the proposed facility's height when explaining their decision. Supervisor Smyth reasoned that the design was not "integrat[ed] ... into the architecture of the site or the community" and was "out of character with [the] area," J.A. at 1432–33, and Supervisor Gross echoed that assessment and also stated that the Wolftrap Fire Station would provide a "better opportunity" for additional cell service. J.A. at 1435–36. Supervisor Hyland compared the proposed facility to a rejected proposal for a facility in his district that was "too tall, too much for the residential community," the citizens of which had voiced concerns that "it changed the residential character of the community." J.A. at 1436–37. Finally, Chairman Bulova stated that the proposed facility was "truly ... out of character" and did not "blend in" sufficiently. J.A. at 1438. These statements clearly demonstrate that the Board was not evaluating the proposed facility solely on the basis of its height and did not issue a categorical prohibition on tall structures. Instead, the Board thoroughly analyzed the Applications according to the Comprehensive Plan and Zoning

Ordinance to determine whether this particular structure would be harmonious with the character of the area and otherwise satisfy the applicable Objectives and standards.

Moreover, the Board members' analysis was supported by the written record, which contains substantial evidence of the proposed facility's adverse visual impact on the surrounding neighborhood. Opponents of the proposed facility presented pictures and photo simulations based on a balloon fly test, J.A. at 1377–79, demonstrating that the proposed facility would be clearly visible from local residents' homes and from across Route 7, J.A. at 0643–46, and that the closest residents "would have a very clear view of the bell tower looming over their home." J.A. at 1379. Out of the twenty-two residences with direct views of the tower, thirteen would have a view of the entire structure. J.A. at 1377. Opponents also presented evidence, including the below picture, demonstrating that the proposed facility would be at least four times taller than the nearby homes and at least twice as tall as the surrounding trees, J.A. at 1376, most of which are deciduous and therefore have no leaves for several months. J.A. at 1382.

J.A. at 0642.

In addition to this evidence of the existing "sparse vegetation," the Board heard evidence that the proposed supplemental plantings would take ten years to grow only 25 feet, less than a quarter of the height of the proposed facility. J.A. at 1383–84.

CWS presented its own photo simulations throughout the application process, including the following two pictures, which showed slightly more screening surrounding the proposed facility but still demonstrated that the facility would have a major visual impact on the surrounding area. The first picture demonstrates the view nearby residents would have of the

tower from a location on Windsor Meadows Lane approximately 680 feet west of the site.

J.A. at 0192.

The second picture, taken from a location on Dreamweaver Court approximately 500 feet southeast of the proposed site, shows the view that local residents and travelers along Route 7 would have of the proposed facility. Both pictures demonstrate the existing sparse vegetation and the significant height difference between the proposed facility and the nearby homes and trees.

J.A. at 0704.

CWS also presented the following photograph of the Dranesville Facility, which shows the scale and visual impact of that existing 120–foot tower.

J.A. at 0667.

Furthermore, although a proposed facility's adverse impact may be "reasonably apparent to non-experts," *Cellco P'ship v. Bd. of Supervisors of Roanoke Cnty.*, No. Civ.A.7:04 CV 000029, 2004 WL 3223288, at *6 (W.D.Va. July 2, 2004), a local realtor testified that there was "absolutely no question" that the proposed facility would negatively impact home values. J.A. at 1399; *see also* J.A. at 0559–0606 (materials submitted by Vicki Stottlemyer to the Board). To rebut evidence of diminished home values, CWS submitted a report by the Fairfax County Department of Tax Administration ("DTA") stating that cell towers do not impact home values, but the DTA Director later clarified that although "DTA [was] not aware of any price impairment caused" by cell towers, he was "not comfortable with an unequivocal statement ... that cell towers do not cause any value impairment." J.A. at 206. Plaintiffs' limited conflicting evidence regarding adverse impact was far outweighed by the evidence that the proposed facility would have a significant adverse impact on the surrounding neighborhood. This showing of adverse impact is substantial evidence that adequately supports the Board's denial. *See New Cingular*, 674 F.3d at 274–75.

The record also contained a significant quantum of evidence that the proposed facility would adversely impact the "character of the property and surrounding areas" and thereby violate Objectives 42(j) and 43 of the Comprehensive Plan. The Board received testimony and correspondence stating that the proposed facility would not fit with the character of the "modest, wooded neighborhood setting," J.A. at 0457, would "become the defining

feature of the neighborhood," J.A. at 1396, and would alter the neighborhood's "unique essence," in part because the religious nature of the design was not in keeping with the diverse character of the neighborhood.[7] J.A. at 1386–87.

Opponents also presented evidence that the proposed facility would not protect the "views of and vistas from" the nearby historical sites, contrary to Objective 42(m). *See, e.g.,* J.A. at 0483. Staff determined that the effect on the historical properties would not be adverse because the facility would be disguised as a bell tower, J.A. at 1268, but the Board was not bound by that assessment and was given evidence that the bell tower design would diminish the bucolic view that visitors would have from the nearby historic cemetery and other sites, and would be particularly inappropriate at the cemetery "for people who want to contemplate and give remembrance to their deceased family." J.A. at 1387; *see also* J.A. at 0651. The evidence of inadequate screening and impact on home values discussed above also demonstrated noncompliance with Zoning Ordinance requirements, in particular, the requirement stressing preservation of an area's character. *See* Zoning Ordinance § 9–006.

Additionally, the Board received evidence that there were alternative sites available on public lands or pre-existing structures that would provide a "similar or equal opportunity to minimize impacts." Objective 42(d). This evidence showed that Applicants had not demonstrated how the proposed site provided the least visual impact "as compared with alternate sites." Objective 42(k). Consequently, the Board had before it a large amount of evidence demonstrating multiple inconsistencies between the proposed facility and the Comprehensive Plan. Such inconsistencies provide substantial evidence supporting the Board's denial. *New Cingular,* 674 F.3d at 274–75.

Plaintiffs argue that the proposed facility does comply with the Comprehensive Plan because Objective 43 encourages camouflage design in the form of a bell tower. Pls.' Summ. J. Br. at 19–20. Plaintiffs contend that a wireless facility can be "stealth" without regards to its height "so long as it incorporates the stealth features called for in the Plan," and argue that denying a proposed bell tower design due to its visual impact makes the special exception process meaningless. *Id.* at 20–21. Plaintiffs further assert that wireless facilities of this kind are "necessarily tall structures" and that the screening and landscaping requirements are meant to minimize just those "aspects of the facility that can reasonably be masked- i.e. the compound and base" and not to mitigate the visual impact of the entire facility. *Id.* at 21–22. In making these arguments, plaintiffs appear to construe the availability of the SE Application as a mandate that the Board must accept a proposed facility if it is camouflaged as a bell tower, no matter its visual impact or effect on adjacent properties. Such an interpretation mischaracterizes the requirements of the Comprehensive Plan

---

**7.** Plaintiffs assert that this is not a permissible basis on which to deny the Applications and cite as support a Third Circuit case in which a local governing body selectively applied a local ordinance to prohibit Orthodox Jewish residents from hanging "lechis" (thin black strips) on utility poles. *Tenafly Eruv Ass'n, Inc., v. Borough of Tenafly,* 309 F.3d 144, 151–54 (3d Cir.2002). The issue here is not whether residents are being prohibited from exercising their religion but whether the design of the proposed facility is in keeping with the character of the neighborhood as mandated by the Comprehensive Plan. There is no evidence that the provisions of the Plan are being selectively applied to discriminate on the basis of religion.

and the Zoning Ordinance. The purpose of an SE Application is to allow a use that is incompatible with the current uses of the land but that will nonetheless be "harmonious with" the Comprehensive Plan and will not adversely impact the surrounding area and its character. *See* Zoning Ordinance §§ 9–001,–006. Simply camouflaging a facility as a bell lower is insufficient to merit a special exception if these other criteria are not satisfied. *See* Zoning Ordinance § 9–001.

The proposed facility, although designed as a bell tower, which is a type of camouflage encouraged by the Plan, is not otherwise harmonious with the Comprehensive Plan and Zoning Ordinance. Objective 43 plainly states that camouflage features like bell towers must "belong to the setting where placed" and "be of a bulk, mass, and height typical of and similar to the feature selected." Objective 43. The proposed facility at issue here, although disguised as a bell tower and located on church property, is four times taller than the existing bell tower on the church grounds and the bell tower at the nearby historic St. Athanasius site, making its size far from "typical" for churches in the area. Furthermore, the record demonstrates that the proposed facility would not "belong to the setting where placed" because ACUMC is a "modest" structure "surrounded by unassuming residences located in wooded neighborhoods" and the proposed facility would change the character of that environment. *See* J.A. at 0481. Opponents of the facility presented the following picture to demonstrate that lack of harmony.

J.A. at 0649.

Therefore, despite its bell tower design, the proposed facility is inconsistent with the Plan. This inconsistency constitutes substantial evidence. *New Cingular,* 674 F.3d at 274–75.

### 2. *Arbitrary and Capricious*

■ In Count IV, plaintiffs allege that the Board's decision was not based on substantial evidence because it was arbitrary and capricious according to state law. Specifically, plaintiffs contend that the Board's approval of a 100–foot tower at the Dranesville Facility and subsequent denial of their proposed facility demonstrates inconsistent and discriminatory application of the Comprehensive Plan. Pls.' Summ. J. Br. at 22–23. Plaintiffs argue that the Dranesville Facility is "materially indistinguishable" from the proposed facility because the tower design is identical, the Dranesville Facility is located on the same

street as ACUMC,[8] and the tower was also approved for an R–1 zoned parcel of similar size and with similar pre-existing uses. *Id.* at 22. Plaintiffs contend that because the Dranesville Facility was "appropriate under the terms of the Plan, there is no room to argue that an identical 120–foot bell tower is not." Pls.' Opp'n Br. at 11. ▮▮▮ Plaintiffs' arguments oversimplify the issue. Under Virginia law, a party claiming discriminatory application of zoning laws must show that "a land use permitted to one landowner is restricted to another similarly situated," and must overcome the presumption that a legislative zoning decision is valid and reasonable. *Bd. of Supervisors v. McDonald's Corp.,* 261 Va. 583, 544 S.E.2d 334, 338–39 (2001) (quoting *Bd. of Supervisors v. Rowe,* 216 Va. 128, 216 S.E.2d 199, 209 (1975)) (internal quotation marks omitted). The zoning decision must be upheld if there is sufficient evidence of reasonableness to make the issue "fairly debatable." *Id.* at 338. Simply comparing the height and bell tower design of the two facilities is insufficient to prove that the facilities are similarly situated and overlooks both the presumption of validity due to the Board's decision and the Board's discretion to conduct "site-specific" reviews of every proposed use in a zoning area. *See AT & T Wireless PCS, Inc. v. Winston–Salem Zoning Bd. of Adjustment,* 172 F.3d 307, 315–16 (4th Cir.

1999) ("*Winston–Salem*") (ruling that an analogous special use application process allowed the municipal Zoning Board "to perform a site-specific review of each proposed use within a designated zone").

Although the designs of the Dranesville Facility and the proposed facility are facially similar, the two facilities are not similarly situated in terms of their context, location, and zoning history. For example, despite the Dranesville Facility being only a slightly larger parcel of land—8.11 acres, as opposed to 7 acres—it differs dramatically from the ACUMC site in being located next to a 29–acre commercial property and having no historic sites within 1.3 miles.[9] Def.'s Opp'n Br. at 20. Because the character of each facility's surroundings is distinct, the impact of each facility on its surroundings would be different. An evaluation of each facility according to the Comprehensive Plan and Zoning Ordinance therefore implicates distinct issues and supports different outcomes. It is clear from this record that the facilities differ substantially on matters that are highly relevant to a 2232 review and an SE Application.

Moreover, the facilities underwent different 2232 and special exception processes. The Dranesville Facility was originally proposed and built as a 100–foot tall structure, and was only later extended to 120 feet through the Feature Shown process,[10]

8. Plaintiffs' argument in this respect is somewhat disingenuous: the facilities are both adjacent to Route 7/Leesburg Pike, a four-lane highway (rather than just a "street"), which runs from the Potomac River to the West Virginia border.

9. This evidence does not appear to be in the written record; however, the Board discussed it in its pleadings and plaintiffs did not object.

10. Facilities that are determined by the Planning Commission to be a "Feature Shown" on the Comprehensive Plan are exempt from the 2232 public hearing requirement. Def.'s

Opp'n Br. at 6 n. 5. Neither party explains the Feature Shown process in detail and the record does not contain the specific provisions applicable to the process; however, Objective 44 of the Comprehensive Plan provides for "Feature Shown Guidelines." Objective 44 states that with Planning Commission approval, telecommunication facilities to be located on existing or replacement structures are considered a "feature shown" of the Comprehensive Plan "to be processed without a public hearing" as long as they comply with certain requirements.

which did not require a public hearing. Def.'s Opp'n Br. at 20. Therefore, in determining whether to approve the initial applications for the Dranesville Facility, the Board examined the impact and compliance of a 100–foot tower rather than a 120–foot tower, and only heard evidence of community opinion with regards to that 100–foot tower. There is no evidence in the record regarding the amount of community support for or opposition to the Dranesville Facility, although there is some evidence of current dissatisfaction with the facility. *See* J.A. at 1371. When the Dranesville Facility was proposed, local residents and the Board based their opinions on the impact of a 100–foot tall structure in an area already subject to commercial uses, rather than a 120–foot tall structure in an entirely residential area surrounded by historical sites. Consequently, the decision-making processes for both applications and the considerations relevant to each are far from identical.[11] Because the Dranesville Facility and proposed facility are not similarly situated, differential treatment of the two facilities does not constitute arbitrary and capricious conduct, and plaintiffs' claim fails in this respect.

Plaintiffs also assert that the Board acted arbitrarily and capriciously by selectively applying the provisions of the Comprehensive Plan, disregarding plaintiffs' evidence regarding the lack of alternative sites and technologies, and espousing an impermissible preference for DAS technology and public lands. Pls.' Summ. J. Br.

at 24. Specifically, plaintiffs argue that they demonstrated that there were no adequate alternative sites, but that the Board arbitrarily disregarded that information and failed to consider plaintiffs' evidence of compliance with the Comprehensive Plan. *Id.* at 23; Pls.' Reply Br. at 9. Plaintiffs assert that "[w]here Applicants demonstrate compliance" with the Comprehensive Plan "to the satisfaction of both Staff and Planning Commission, only to have evidence of compliance ignored by the Board, the result is arbitrary under Virginia law and thus cannot constitute substantial evidence under federal law." Pls.' Summ. J. Br. at 24. In response, the Board correctly acknowledges that the Comprehensive Plan does not favor DAS technology over stealth designs,[12] but encourages applicants to consider various types of mitigation, including use of alternative technologies. Def.'s Opp'n Br. at 8 n. 6. The Board contends that the Applicants failed to establish that other forms of mitigation, including use of DAS nodes or alternative sites, would not be feasible or adequate alternatives that would produce less of an impact. *Id.* at 19.

Plaintiffs misconstrue the requirements of the Comprehensive Plan by arguing that simply designing a facility to resemble a bell tower and labeling it as "stealth" or providing camouflage is sufficient to gain approval under the 2232 and special exception processes. This argument ignores the clear provisions of the Comprehensive Plan, which call for co-location on existing facilities when available, Objective 42(a);

---

11. Moreover, although neither party has raised this issue, it appears that the Board evaluated the Dranesville Facility according to a different edition of the Comprehensive Plan. Portions of the Policy Plan specific to telecommunications facilities were amended in 2013. Those amendments led to the addition of Objective 42(c), which calls for consideration of micro-cell technologies like

DAS. *See* Proposed Comprehensive Plan Amendment, available at http://www.fairfaxcounty.gov/dpz/comprehensiveplan/amendments/sl2–cw–2cp.pdf.

12. Both this concession and the plain language of the Comprehensive Plan make plaintiffs' preemption argument irrelevant. Pls.' Summ. J. Br. at 25.

mandate consideration of feasible "camouflage structure design and/or micro-cell technologies," Objective 42(c); express a preference for public sites when they provide a "similar or equal opportunity to minimize impacts," Objective 42(d); and require that an applicant show that the proposed facility will have "the least visual impact ... as compared with alternate sites." Objective 42(k). By requiring the plaintiffs to demonstrate that the proposed facility was consistent with these provisions, the Board did not arbitrarily or selectively apply the Plan; rather, it is plaintiffs who seek to selectively follow the Plan's provisions and rely exclusively on stealth design.

■ Moreover, the Board was not required to defer to any recommendations or determinations made by Staff or the Planning Commission and is permitted under Virginia law to overturn those decisions. Va.Code Ann. § 15.2–2232(B); Zoning Ordinance § 9–001. The Planning Commission and Staff's finding that the proposed facility was in compliance with the Comprehensive Plan can serve as relevant evidence, but it can be outweighed by other evidence in the record. *Va. Beach*, 155 F.3d at 430–31. Based on the Board's *de novo* review of the substantial evidence in the record, the Board reasonably reached a different conclusion than those entities. The Staff and the Planning Commission's satisfaction with plaintiffs' evidence does not demonstrate that the Board's contrary decision was arbitrary and capricious or that the Board ignored relevant evidence.

■ In addition to misinterpreting the Comprehensive Plan and Virginia law, plaintiffs also misconstrue the weight of the evidence for and against their proposal in asserting that the Board arbitrarily ignored the evidence plaintiffs presented. Plaintiffs argue that they proved that DAS was not a feasible alternative. Plaintiffs base this argument almost entirely on Dugan's testimony, referring to Dugan as an "expert witness" whose testimony was unrebutted and stating that no party objected to his expert qualifications. Pls.' Summ. J. Br. at 12. Contrary to plaintiffs' assertion, it is unclear whether Dugan was designated as an expert witness for the administrative proceeding; however, it is clear that Dugan was not designated as an expert for the purposes of this litigation.[13] Therefore, as the Board argues, Dugan's statements and opinions should be evaluated solely on the basis of what is contained in the written record. *See* Def.'s Opp'n Br. at 16–17. The Board contends that that record shows that Dugan's opinions and reports are unreliable and unsupported by any data or methodology. *Id.* at 15–16.

Drawing all reasonable inferences in favor of the plaintiffs and even assuming that Dugan was in fact properly qualified as an expert, the quantum of evidence Dugan provided does not show that the Board lacked substantial evidence or acted arbitrarily and capriciously when it denied the Applications, particularly when compared to the contradictory evidence presented by the opposition. With regards to

---

13. Although plaintiffs' counsel stated to the Board that plaintiffs had asked the Planning Commission to qualify Dugan as an expert witness, J.A. at 1362, the transcript of the Planning Commission meeting does not indicate that Dugan was actually presented as an expert witness. J.A. at 0012 (introducing Dugan to the Planning Commission only as "an engineer who is working on behalf of Verizon

Wireless"). Moreover, this Court ordered that review of the Board's decision in the case would be based exclusively upon the Written Record and that there would be no additional disclosure of expert testimony or expert discovery or reports. Agreed Order Amending the Joint Report and Discovery Plan [Dkt. No. 15].

576

576

the use of DAS technology, Dugan opined that DAS was not a feasible option due to the low height of DAS nodes and the area's sloping terrain. J.A. at 1365–66. When testifying before the Planning Commission, Dugan stated that DAS nodes "only offer of [sic] spot coverage or capacity relief to a very small area" due largely to their lower antenna height, that a "substantial number of DAS nodes [would be] necessary to equate to the level of coverage and capacity afforded by the proposed facility," and that existing poles would have to be replaced by taller ones to make the option feasible. J.A. at 0013–14. Dugan's testimony simply indicated that a large number of nodes and higher poles might be required, which might make the option more expensive but not unfeasible. Moreover, Dugan's opinion that DAS nodes would not be "less intrusive," J.A. at 0014, is irrelevant because the Fourth Circuit does not follow the "least intrusive means" approach to wireless facility applications, and Dugan was testifying about technological alternatives not about visual impact.

Even when applicants present the testimony of numerous experts, the views of the community "will often trump those of ... experts in the minds of reasonable legislators." *Va. Beach*, 155 F.3d at 430–31. Numerous community members expressed their opinions and offered specific evidence to contest Dugan's assertions. For example, opponents presented evidence that DAS nodes are already in use at various locations in Fairfax County and that the nodes "work very well where there's a lot of topographical challenges"

because that is "what they're designed for." J.A. at 1394. With this contradictory evidence and community opposition, and absent additional supporting data from Dugan, the Board was justified in rejecting Dugan's conclusions. Moreover, there is no evidence from which a reasonable juror could find that the Board actually ignored Dugan's evidence in reaching its decision; rather, the record indicates only that it found substantial evidence contradicting it.

■■■ Plaintiffs also argue that Dugan's testimony and reports demonstrate that there were no existing or alternative sites that would adequately serve the Applicants' needs, and that the Board arbitrarily disregarded that evidence. The dispute over the availability of alternative sites focused primarily on the Providence Baptist Church Steeple ("Providence Steeple") and the Wolftrap Fire Station # 42 ("Fire Station"). The Providence Steeple is an existing structure that already hosts wireless carriers and would have room for colocation of at least a 40-foot antenna,[14] and the Fire Station is a public site owned by Fairfax County that could host a flag pole monopole.

SACCT submitted uncontradicted evidence that the Applicants had originally characterized the Fire Station as their "ideal location," but had to choose the ACUMC site instead because the Fire Station was deed restricted and unavailable, assertions that were found to be incorrect. J.A. at 0876, 1373. Applicants later changed their proposal and stated that the Fire Station would be a viable location, but only in conjunction with a site at ACUMC.

14. There is dispute over the exact height at which an antenna could be placed on the Providence Steeple. Opponents of the proposed facility stated that the antenna could be located at 55 feet, J.A. at 0180–11–12, while Dugan testified to the Planning Commission that it could only be located at 40 feet. J.A. at

0013. Neither side provides additional support and the Court cannot draw reasonable inferences in either party's favor; however, the Board was presented with these conflicting assertions regarding height, meaning that Dugan's testimony in this respect was at least contested, if not rebutted.

J.A. at 0242. This "two-site strategy" involved a site to the east, which CWS stated had to be ACUMC, and a site to the west, which CWS stated the Fire Station could provide. J.A. at 1236. CWS affirmatively stated in its application materials that it had no immediate intention of developing the site to the west. *Id.* Dugan represented to the Planning Commission that the Fire Station alone was not an adequate alternative to the proposed facility because relying solely on a site at the Fire Station would leave a .75 mile gap in coverage along Leesburg Pike. J.A. at 1316. Verizon also sent the Planning Commission a letter stating that the Fire Station would "benefit our network" but would not replace the need for the site at ACUMC. J.A. at 1243. Regarding the Providence Steeple, Dugan represented that the site would not be a suitable alternative because it would not be tall enough and, at a distance of .5 miles from ACUMC, would be "too far from the heart of the target area." J.A. at 1316.

Plaintiffs' arguments are unconvincing on their face, especially in light of CWS's earlier position that the Fire Station was the "ideal location" and the short distance between the Providence Steeple and ACUMC. Moreover, these arguments do not adequately address other options raised by opponents. For instance, the applicants did not address the feasibility of alternative arrangements such as a monopole at the Fire Station in combination with DAS nodes to cover the purported .75 mile gap on Leesburg Pike; a lower tower at the proposed site in conjunction with a monopole at the Fire Station; expansion of an existing tower; or co-location on the Providence Steeple in combination with an additional monopole at the Fire Station or DAS nodes. *See* Def.'s Summ. J. Br. at 27–28. Opponents presented maps, charts, testimony, and other evidence supporting such alternative solutions that provided the Board with enough conflicting evidence that, in combination with the evidence of adverse impact and inconsistency with the Comprehensive Plan, provided the Board with substantial evidence on which to base its denial. *See, e.g.,* J.A. at 0336, 0659–64, 1391–94.

Plaintiffs contend that the Board's reliance on community input violated the substantial evidence standard, and contrast Dugan's expert testimony with the testimony and evidence presented by opponents, describing the latter as "unsubstantiated claims" based on conjecture and speculation. Pls.' Summ. J. Br. at 28–29. Plaintiffs also argue that the "number of persons expressing concerns, standing alone, does not make evidence substantial," and that it is irrelevant that almost all of the proposal's supporters were also members of ACUMC. *Id.* at 29 (quoting *Petersburg Cellular P'ship v. Bd. of Supervisors of Nottoway Cnty.,* 205 F.3d 688, 695 (4th Cir.2000) ("*Petersburg Cellular*")); Pls.' Opp'n Br. at 15 (citing *T-Mobile Ne., LLC v. City Council of Newport News, Va.,* 674 F.3d 380, 389 (4th Cir.2012) ("*Newport News*")).

Plaintiffs' attempt to minimize the weight of the community opposition is misplaced. The opposition to this proposal far outweighed the community opposition in *Newport News,* where the court "note[d] the absence of repeated and widespread opposition" and described the turnout as "anemic" when just one person sent an email and three people spoke at a hearing in opposition. *Newport News,* 674 F.3d at 390 (internal quotation marks omitted). To the contrary, the community opposition here was consistent and widespread, far exceeding one email and three speakers. A survey of residents who lived within .75 miles of the proposed site showed that over 200 of those local residents or 91% of those surveyed opposed the facility. J.A.

at 0637, 1380–81. In addition, a total of 750 individuals signed petitions opposing the site, J.A. at 0637, 62 citizens sent Supervisor Foust emails expressing their opposition, J.A. at 1419, and 17 citizens spoke before the Board on behalf of SACCT and local residents. Def.'s Summ. J. Br. at 3.

This opposition was not only consistent and widespread but was also "specific, organized, and grounded in valid concerns." *New Cingular Wireless PCS, LLC v. Fairfax Cnty. Bd. of Supervisors*, No. 1:10cv283, 2010 WL 4702370, at *5 (E.D.Va. Nov. 10, 2010) *aff'd*, 674 F.3d 270 (4th Cir.2012). The residents conducted field tests regarding coverage, J.A. at 0654, sent dozens of emails, responded to surveys and petitions, J.A. at 1380–82, met with CWS and Staff, and gave detailed presentations to the Planning Commission and the Board. *See, e.g.*, J.A. at 0636–65. The community's concerns were not "irrational," *contra* Pls.' Opp'n Br. at 15, but instead focused on the proposed facility's compliance with the Comprehensive Plan. For instance, residents pointed out that the proposal lacked harmony and consistency with the surrounding neighborhoods and structures, J.A. at 1385, tailed to consider locating the facility on a pre-existing structure, ignored the impact on historical vistas, J.A. at 1374, and lacked adequate screening to mitigate visual impact. J.A., at 1382–84.

Similarly, many of the emails sent by opponents to Supervisor Foust and the Planning Commission listed eight specific objections, including that the proposed facility was "contrary to the spirit and language of the Fairfax County Comprehensive Plan," that the facility's proposed height was "inappropriate for the neighborhood" because it would "tower over the buildings, homes and trees in the area" and would lack adequate screening, that the scale of the facility was not consistent with existing local bell towers, that the proposed facility would impair vistas of and from historical sites, that alternative sites and technologies should be considered first, that the proposed facility would increase traffic issues, and that the community opposed the tower. *See, e.g.*, J.A. at 0457–0511.

The opposition did raise concerns that have previously been deemed unreasonable or impermissible under the Act, including health concerns, the danger of children climbing on the tower, and the potential for the tower to collapse, *see, e.g.*, J.A. at 0044, but the overall weight of the community concerns was "objectively reasonable because they were based on known experience about the effects that commercial uses can have on a residential neighborhood" and particularly on this specific neighborhood. *See Petersburg Cellular*, 205 F.3d at 695. In contrast, the citizens who emailed and spoke in favor of the facility were smaller in number and were almost exclusively members and trustees of ACUMC, many of whom wrote that the proposed facility would financially benefit the church to enable it to continue with its ministries. *See, e.g.*, J.A., at 0180–60, Financial benefit to a private entity has never been deemed a valid concern under the Act or Comprehensive Plan, and even without this vested financial interest, the citizens in favor of the proposed facility were outnumbered by the opposition and did not present anywhere close to the number of specific arguments raised by opposition. Therefore, because the Board based its denial of the Applications in part on "the reasonably-founded concerns of the community … undoubtedly there is substantial evidence to support the body's decision." *Petersburg Cellular*, 205 F.3d at 695. (internal quotation marks and emphasis omitted).

Accordingly, plaintiffs have not provided sufficient evidence from which any reasonable juror could find that the Board's decision to deny the SE Application and reverse the Planning Commission's acceptance of the 2232 Application was not supported by substantial evidence and was arbitrary and capricious. Therefore, summary judgment will be granted to the Board on Counts I and IV.

### E. *Count II: Prohibition of Service*

■ In Count II, plaintiffs allege that the Board's decision prohibits or has the effect of prohibiting the provision of "personal wireless services" by Verizon and therefore violates 47 U.S.C. § 332(c)(7)(B)(i)(II). Pls.' Summ. J. Br. at 30. The Act defines "personal wireless services" to "mean commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services." 47 U.S.C. § 332(c)(7)(C)(i). The Federal Communications Commission ("FCC") ruled in 2007 that wireless broadband Internet access services do not qualify as "personal wireless services" under that definition but are instead treated as "information services." *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 F.C.C.R. 5901, 5901–02 ¶ 1 (2007). "Information services" are nonetheless protected by the Act when "a wireless service provider use[d] the same infrastructure to provide its 'personal wireless services' and wireless broadband Internet access service," *Id.* at 5923–24, ¶ 65. Therefore, when there is "[c]ommingling" of services at a proposed facility, the facility is deemed to be a "personal wireless facility." *Id.*

■ The Court reviews a claim of effective prohibition of service *de novo*. *Loudoun Cnty.*, 748 F.3d at 192 (citing 47 U.S.C. § 332(c)(7)(B)(v)). Although the Court has determined that Verizon does not have standing in this litigation, in the interest of creating a complete record, the plaintiffs' argument about this issue will be addressed. To prevail on a prohibition of service claim, a wireless carrier must show either "that a local governing body has a general policy that essentially guarantees rejection of all wireless facility applications," or that "denial of an application for one particular site is 'tantamount' to a general prohibition of service." *T–Mobile Ne., LLC v. Fairfax Cnty. Bd. of Supervisors*, 672 F.3d 259, 266 (4th Cir.2012) (citations omitted) ("*Fairfax Cnty.*"); *see also New Cingular*, 674 F.3d at 275–76.

■ Under the latter theory, a plaintiff must demonstrate both "a legally cognizable deficit in coverage amounting to an effective absence of coverage" and a lack of "reasonable alternative sites to provide coverage."[15] *Fairfax Cnty.*, 672 F.3d at 268. Demonstrating a lack of reasonable alternatives requires showing that "further reasonable efforts to gain approval for alternative sites would be fruitless." *id.* (internal quotation marks omitted). A plaintiff's burden of proof on a prohibition of service claim "is substantial and is particularly heavy when … the plaintiff already provides some level of wireless service to the area," because "the Act cannot guarantee 100 percent coverage." *Id.* Therefore, a plaintiff cannot demonstrate prohibition of service in "the ordinary situation in which a local governing body's decision simply limits the level of wireless services available" or merely by showing

**15.** The Applicants presented evidence of "need" using letters of interest from T–Mobile and Sprint. J.A. at 0696–97. These letters of interest are not helpful to plaintiffs because they were non-binding expressions of interest and spoke only of improving wireless service in the area rather than resolving an effective absence of coverage.

that alternative sites would not eliminate the entire coverage deficiency or provide the same level of coverage as the proposed facility. *Id.* at 268–69.

Although a denial of coverage claim is "a fact-bound inquiry," the Fourth Circuit has found that a local county board's decision denying an application did not prohibit service where there were "genuine factual disputes" about the absence of service in an area, and where the board demonstrated through a record of prior approvals that it was not generally hostile to wireless services. *360° Commc'ns Co. of Charlottesville v. Bd. of Supervisors of Albemarle Cnty.*, 211 F.3d 79, 87–88 (4th Cir. 2000) ("*360 Commc'ns*"); *see also T-Mobile Ne., LLC v. Howard Cnty. Bd. of Appeals*, 524 Fed.Appx. 9, 15 (4th Cir. 2013) (stating that the Fourth Circuit "also consider[s] a zoning board's past decisions on applications" in an assessment of whether future efforts would be fruitless).

Plaintiffs have not argued that the Board has a general policy guaranteeing rejection of all applications for wireless facilities, nor is there any evidence that the Board does have such a policy. Instead, Verizon claims that it demonstrated an effective absence of coverage through Dugan's testimony and propagation maps, arguing that the Board and the proposal's opponents did not present any expert testimony or professionally prepared data contradicting Dugan's evidence. Pls.' Summ. J. Br. at 31. The Board counters that Verizon's evidence did not demonstrate any significant gap in coverage and showed only that Verizon sought to im-

prove existing coverage and provide capacity relief. Def.'s Summ. J. Br. at 22–23. The parties also dispute whether the 4G LTE service plaintiffs seek to provide is a "commercial mobile service" covered by the Act. The Board argues that Verizon seeks only to provide wireless internet services that are "information services" rather than a "commercial mobile service." *Id.* at 25–26. Plaintiffs respond that the data and voice services are commingled and thereby protected and, in the alternative, that the FCC's recent reclassification of mobile broadband Internet access as a mobile service is controlling.[16] Pls.' Opp'n Br. at 28–29.

 The parties raise these arguments regarding "information services" only in their summary judgment papers, without explicit discussion of the distinction between "personal wireless services" covered by § 332(c)(7) and any services beyond that section's purview. Had the Board made its decision after March of 2015, the issue would be easily resolved, because the FCC's March 2015 ruling clearly reclassifies the 4G LTE coverage Verizon seeks to provide as a "commercial mobile service;" however, because the Board made its decision in December 2014, the relevant inquiry is whether Verizon has demonstrated that the proposed facility would use the same infrastructure to provide both "personal wireless services" as defined before March 2015 and 4G LTE coverage. Plaintiffs contend that the "inherently interdependent design" of "wireless telecommunications and information networks" means it is "impossible to isolate 'data' sites . . .

16. In March 2015, after the Board denied the Applications, the FCC reclassified mobile broadband Internet access service as a "commercial mobile service," meaning that an effective prohibition of wireless broadband services now violates the Act. *Protecting and Promoting the Open Internet*, 30 F.C.C.R. 5601, FCC 15–24, GN Dkt. No. 14–28; 178

¶ 388 (Mar. 12, 2015). The FCC stated that the "classification decisions" made in that ruling would "apply only on a prospective basis." *Id.* at 134 ¶ 308 n. 792. Therefore, this reclassification has no relevance to this lawsuit. Verizon is engaged in legal efforts to overturn that classification decision. Pls.,' Opp'n Br. at 29, 29 n. 8.

from 'voice' sites" under the terms of the statute, Pls.' Reply Br., at 15, because "when the Verizon Wireless network off-loads data traffic to a 4G LTE site, voice communication through other sites on the Verizon Wireless network improves." Pls.' Opp'n Br., at 28. Plaintiffs further argue that the use of "modern voice transmission technologies such as a Voice over LTE and High Definition Voice" show that an LTE network still carries voice communications and is commingled with "personal wireless services." *Id.* at 28–29.

To support these assertions, plaintiffs point to Dugan's testimony before the Board regarding these "technical reali-ties." *Id.* (citing J.A. at 1363–64). During that testimony, Dugan discussed the growth in "data uses" that require Verizon to upgrade to 4G LTE, the improved sig-nal levels "required to provide voice and data services" on LTE smartphones, and Verizon's use of "voiceover LTE," which Dugan described as "the voiceover riding over a high-speed broadband network" and producing "[h]igh definition quality." J.A. at 1363–64. Dugan did not refer to "voice-over LTE" in his testimony before the Planning Commission or in his report to the Planning Commission, nor did he dis-cuss any type of coverage other than 4G LTE in those submissions.

Neither plaintiffs' assertions nor Du-gan's testimony demonstrate that Verizon intended to commingle "personal wireless services" and wireless broadband Internet services at the proposed facility. Instead, the record indicates that Verizon sought to use the proposed facility to provide wire-less broadband Internet services including 4G LTE and Voiceover LTE. Few courts have addressed this issue, but at least one

court has found that a proposed site in-tended to provide only 4G service did not qualify as a "personal wireless facility" under the FCC's pre–2015 rulings because it would be used "solely to provide an 'information service.'" *Clear Wireless LLC v. Bldg. Dep't of Lynbrook*, No. 10–CV–5055, 2012 WL 826749, at *6–7 (E.D.N.Y. Mar. 8, 2012).[17] In *Clear Wire-less*, the wireless provider "implied that a failure to upgrade to 4G could negatively impact ... personal wireless services, leading to a deficiency in voice services;" however, the court found that the provider had not supported this assertion "beyond an anecdote about an increase in dropped calls." *Id.* at *7. Plaintiffs in this case have not provided even that amount of evidence. At best, plaintiffs' assertions and Dugan's testimony show that the pro-posed facility would improve voice cover-age currently provided by other sites. Plaintiffs do not show that the proposed facility would provide both 4G LTE cover-age and "personal wireless services" at the same site, using the same infrastructure. Plaintiffs' contentions about "Voice over LTE and High Definition Voice" similarly fail to show that the proposed facility would commingle "personal wireless ser-vices" and "information services," because Dugan's testimony indicates that "Voice Over LTE" is simply another type of wire-less broadband Internet service, *See* J.A. at 1364.

■ Even if Verizon could show that 4G LTE and "personal wireless services" would be sufficiently commingled at the proposed site to qualify the site as a "per-sonal wireless facility," Verizon still cannot make out a prohibition of service claim because it has not proven that there is an

---

17. This case and an additional case, *Arcadia Towers LLC v. Colerain Twp. Bd. of Zoning Appeals*, No. 1:10–CV–00585, 2011 WL 2490047 (S.D.Ohio June 21, 2011), appear to be the only two decisions addressing a prohi-bition of service claim regarding "information services," and they are the only two cited by the parties in their summary judgment briefs.

effective absence of coverage. Instead, "Verizon Wireless freely concedes that it is trying to enhance its network and provide better service to its customers." Pls.' Opp'n Br. at 25. Verizon represented to the Planning Commission and Board that it sought to "improve its wireless telecommunications network" in the area, thereby acknowledging an existing level of service, J.A. at 0767. Plaintiffs also stated in their Amended Complaint that Verizon "is in the process of transitioning its technology to 4G or Long Term Evolution ("LTE") service. LTE offers not only higher capacity (call volume) per site, but also makes possible additional wireless services such as mobile data and location-based services, thus expanding the utility and reliability of wireless services." Am. Compl. ¶ 17. Verizon also claimed that without a sufficient number of cell sites in any one area, Verizon would "not be able to provide uninterrupted service." Id. ¶ 19. These representations reflect Verizon's desire to provide 100% coverage and to improve and expand its services, not to resolve a legally cognizable gap in those services. Such goals are not protected by the Act.

Similarly, Dugan represented to the Planning Commission and Board that Verizon had to "build ahead of the curve in order to meet the demand for service," J.A. at 0079, and needed to "upgrade their networks;" that the proposed facility would "provide coverage benefits as well as capacity off-loading benefits," J.A. at 1364; that it was "critical for Verizon Wireless to relieve traffic" from nearby sites, J.A. at 0013; and that the proposed facility would "[i]ncrease capacity," J.A. at 0016, "improve service and provide better handoff between the existing sites serving the heavily traveled Leesburg Pike," and provide "0.5–1.0 mile of enhanced new 4G LTE service to the area." J.A. at 0723.

Dugan's statements before the Planning Commission and the Board consequently referred only to improving existing coverage and increasing capacity for offloading from existing sites in the area, rather than to remedying any effective absence of coverage in the area. See J.A. at 0012–14, 1363–64. In fact, Dugan stated that "LTE service is currently available in the area," but that the latest form of technology required better signal levels because it does not work "in all areas at all times." J.A. at 1363–64. Therefore, plaintiffs' evidence demonstrates that there are existing Verizon sites in the area providing coverage, that there is at most a one-mile gap in 4G LTE coverage but not in 3G or traditional voice coverage, and that Verizon wishes to improve 4G LTE coverage rather than resolve an absence of coverage. Such improvements may be desirable, but they are not protected from local decisionmaking under 47 U.S.C. § 332(c)(7)(B)(i)(II).

Despite Verizon and Dugan's characterization of the issue, Verizon persists in arguing that there is in fact evidence of an effective gap in coverage, relying primarily on the propagation maps produced by Dugan. These maps were based on a target signal level of –95 dBm RSRP (reference signal received power) and showed an area of white space denoting in-building coverage that fell below that level. J.A. at 0724, 730–32. According to Dugan's testimony and the maps, the proposed facility would resolve this gap, id.; however, these maps, like Dugan's testimony, are focused exclusively on a particular level of 4G LTE service, rather than 3G or traditional voice coverage. Dugan stated that RSRP "is generally the preferred signal measurement used for LTE networks" and acknowledged that the maps contained a margin of safety (fade margin)[18] because

---

18. The extent of this fade margin was not identified by either Dugan or Verizon. Def.'s

below this threshold "the connection and download speed of broadband wireless internet services degrades dramatically." J.A. at 0724. Dugan's testimony shows that the white space on the maps does not correspond to an effective absence of overall coverage but rather to a diminished level of wireless internet services. Although these maps demonstrate that the Board's decision may have the effect of limiting the level of data or wireless internet services Verizon can provide, they do not prove that there is an effective absence of coverage that the Board's decision would prohibit Verizon from resolving.

Moreover, Dugan's propagation maps conflict with marketing maps available on Verizon's website, which show full 4G LTE coverage where Dugan's show white space, and which state that even when 4G LTE is not available customers may connect to 3G service instead. J.A. at 0824. Although Dugan and Verizon argue that these marketing maps "are not an exact representation of coverage," J.A. at 0724, they serve both to cast doubt on the reliability of Dugan's testimony and to provide relevant evidence that Verizon has significant existing coverage in the area, even if it is not full 4G LTE coverage at all times in all places. Therefore, even if Dugan's maps demonstrate some gap in 4G LTE wireless and data coverage, they do not meet Verizon's heavy burden of demonstrating an effective absence of all forms of coverage.

Furthermore, Dugan did not provide any data or other evidentiary basis for his maps and conclusions, and Verizon did not provide any additional data beyond Dugan's maps and testimony to demonstrate an effective absence of coverage. In particular, the Board highlights Verizon's failure to submit field test data, complaint logs, dropped or lost call data, maps for projected DAS coverage on Route 7, or a propagation map for voice only service rather than data service. Def.'s Summ. J. Br. at 24.[19] Dugan stated that Verizon uses "a wide variety of propagation models, drive tests, customer complaints, and other things" to determine where facilities are needed, J.A. at 0079; however, neither Dugan nor Verizon presented evidence of, or data from, these models or tests beyond the propagation maps. Dugan stated that his analysis was based on drive test data, J.A. at 0724–25, but he never provided that data or any other data supporting the maps or his testimony, even though he has done so in other cases where he served as an expert witness. *See Omnipoint Commc'ns Enters., L.P. v. Zoning Hr'g Bd. of Easttown Twp.*, 331 F.3d 386, 392 (3d Cir.2003) (Dugan oversaw "drive tests in which approximately six hundred forty actual calls were made using eight cell phones of various providers" to track the number of dropped calls and instances of no service.); *see also New Cingular Wireless PCS v. Zoning Hr'g Bd. of Weisenberg Twp.*, No. 06–2932, 2009 WL 3127756, at *4 (E.D.Pa. Sept. 29, 2009) (defendants' expert conducted drive tests and reviewed the drive tests conducted by Dugan and another expert). If Dugan collected any such data in this case he did not present it to the Planning Commission or the Board.

Summ. J. Br. at 25.

19. SACCT presented an email chain showing that Staff requested such additional information from Verizon before issuing its report, J.A. at 1098–1101, and Staff later told the Planning Commission that the Applicants did not provide everything suggested but did submit an amount of information consistent with other 2232 applications. J.A. at 0081, 0613. Verizon emphasizes Staff's statement that the additional requested information was not required or essential and argues that dropped call logs are an antiquated metric not required to demonstrate an absence of coverage. Pls.' Reply Br. at 15 (citing J.A. at 0613).

Instead, it was the opponents of the proposed facility who crowd-sourced data, J.A. at 0654, and conducted multiple field tests which demonstrated that Verizon customers had strong to adequate service in the area of the purported coverage gap. J.A. at 0180–55–59. Although the members of SACCT are not professional engineers, that they furnished this data, and Dugan and Verizon did not provide anything like it, further highlights the plaintiffs' overall lack of evidence. At the very least, SACCT's evidence showed that "genuine factual disputes" exist over the absence of coverage in the relevant area. See 360° Commc'ns, 211 F.3d at 87–88. This showing provides a sufficient basis to find that the Board's decision did not result in a prohibition of service.

Finding that on this record Verizon has not demonstrated an effective absence of coverage does not mean that dropped call data or any specific forms of evidence are required to prove a prohibition of service claim; rather, this finding is based on Verizon's failure to meet its "particularly heavy" burden of proof by supplying sufficient evidence to demonstrate an effective absence of coverage. At most, Verizon's evidence indicates that the Board's decision prevents Verizon from improving existing service, particularly wireless internet and data service, but it does not demonstrate that the decision prohibits Verizon from providing personal wireless services under the terms of the Act.

 Even if Verizon had proven that there are cognizable gaps in coverage, Verizon must also demonstrate that no reasonable alternative sites could provide that coverage and that further efforts to gain approval of alternate sites would be futile. In determining the availability of other sites, the Fourth Circuit has explicitly rejected the use of "any specific formula" such as the "least intrusive means" test

used by several circuits and focuses instead on "a fact-based analysis of the record." Fairfax Cnty., 672 F.3d at 266–67; see also 360° Commc'ns, 211 F.3d at 87.

Plaintiffs argue that they "meticulously examined 14 alternative sites before concluding that Andrew Chapel was the only feasible location" for the proposed facility, Pls.' Reply Br., at 17, and cite Staff and the Planning Commissions' findings that they adequately explored alternative sites. Pls.' Opp'n Br. at 25. That these entities credited plaintiffs' assertions is irrelevant to the prohibition of service claim and does not compensate for plaintiffs' lack of additional evidence on the issue, because, as stated before, neither the Court nor the Board owes deference to Staff or the Planning Commission's determinations.

Moreover, simply "examining" alternative sites does not suffice; Verizon must also show that those sites are not reasonable alternatives that would resolve at least some of Verizon's purported coverage gap. The parties' debate over alternatives focused in particular on the availability of the Fire Station, the Providence Steeple, DAS nodes, or some combination thereof. Verizon again relies almost exclusively on Dugan's testimony and propagation maps to support its claim that it adequately examined and eliminated those options. Dugan stated that he made a site visit to the Fire Station and Providence Steeple, and that those sites did not "fulfill the objectives" of the proposed facility. J.A. at 0724. Regarding the Fire Station, CWS stated that the site was "too far west," J.A. at 1290, and Dugan stated that the site would leave a "0.75 mile coverage gap" and would "not provide enough coverage overlap" with the existing facilities in the area to allow for capacity relief. J.A. at 0724. Plaintiffs assert that these conclusions were "carefully documented with scientific evidence," Pls.' Opp'n Br. at 26, but that

evidence consists only of Dugan's propagation maps, which are not only unsupported by data or methodology but also demonstrate a large overlap between the coverage the Fire Station and the proposed facility would respectively provide. J.A. at 1310–12. Beyond this evidence, plaintiffs' main additional argument is that a 2232 review and other steps would be required to build a facility at the Fire Station, but there is no indication that meeting these requirements would be difficult given the Board's interest in that site being considered, *see* J.A. at 1426, and it is well established that "the difficulties in meeting such restrictions are insufficient to establish that a provider lacks reasonable alternatives." *Fairfax Cnty.*, 672 F.3d at 269; see also *New Cingular*, 674 F.3d at 276.

Dugan ruled out the Providence Steeple as being too short and far away from "the target area" to meet coverage objectives, even though it is a half mile from the proposed facility. J.A. at 0724. He did not produce a propagation map or any additional data to demonstrate the coverage that the Providence Steeple might provide or how that coverage might be inadequate. Instead, he made additional unsupported assertions that reducing the proposed antenna height would "compromise" and "reduce[ ]" service in contrast to the proposed height, which would instead "provide service to a far wider area." *Id.* Again, he presented no evidence demonstrating exactly how much coverage the Providence Steeple or a lower antenna at the proposed site would provide.

Dugan's assertions that DAS nodes are not feasible were similarly conclusory and contradicted by evidence of existing nodes in the area. Additionally, Dugan did not present evidence regarding how a combination of any of these options—the Fire Station, Providence Steeple, a lower tower

at ACUMC, and/or DAS nodes—might affect coverage. Therefore, plaintiffs fail to demonstrate that alternative sites would not serve at least some of Verizon's purported coverage needs. Dugan's testimony shows only that these alternative sites might not serve those needs as well as the proposed facility, which is insufficient to prove that they are not reasonable alternatives. *Fairfax Cnty.*, 672 F.3d at 269 (affirming the denial of plaintiff's application where its "several declarations, along with some exhibits" simply presented "very general conclusions regarding the feasibility of alternative locations, including repeated assertions that the locations 'would not allow T–Mobile to meet its coverage objectives' ").

Plaintiffs try to save Dugan's testimony by arguing that the Board's decision to disregard his testimony "was based on nothing more than the unsupported opinion of a single Supervisor." Pls.' Summ. J. Br. at 32. This argument appears to refer to Supervisor Foust's estimate that there was a 60% overlap in coverage between the Fire Station and the proposed facility. J.A. at 1426. Supervisor Foust appears to have based his opinion at least in part on Dugan's propagation maps, which show a substantial overlap between the coverage that the Fire Station and the proposed facility would each provide that opponents estimated to measure from 50 to 70%. J.A. at 0114–15. These maps demonstrate that the Fire Station could provide at least half of the desired coverage. Plaintiffs' failure to provide any evidence to the contrary, other than their conclusory statements that the Fire Station would "not provide enough coverage overlap" for capacity relief, means they have not satisfied their heavy burden of proving that the Board has prohibited them from providing coverage.

Moreover, plaintiffs fail to demonstrate that further efforts to obtain approval of alternate sites or designs would be fruitless. Plaintiffs claim that the process of working with Staff to refine the proposed facility, only to have the proposal rejected by the Board, demonstrates that further efforts would be fruitless. Pls.' Reply Br. at 19. They also argue that the Board's refusal to accept any structure with the height plaintiffs require and refusal to consider evidence in support of plaintiffs' proposed structure shows an "unalterably closed mind." *Id.* at 20 (internal quotation marks and citations omitted); Pls.' Summ. J. Br. at 33.

As discussed above, the Board's justification for rejecting the proposed facility was not simply that it was "too tall," *contra* Pls.' Summ. J. Br. at 33; rather, the Board's rejection was based on the proposal's overall visual impact and noncompliance with multiple provisions of the Comprehensive Plan and Zoning Ordinance. Nothing in this record shows that the Board is unwilling to accept any proposed wireless facility. In fact, although this evidence is not in the record, the Board represented that it has approved 550 applications since 2010, 87 of which were Verizon's applications, Def.'s Opp'n Br. at 10, and the Fourth Circuit has recognized the Board's "strong history of approving wireless facilities." *Fairfax Cnty.*, 672 F.3d at 269. Additionally, in issuing its denial of the Applications, the Board expressed interest in the availability of alternative sites and technologies, including the Fire Station and DAS, J.A. at 1461, thereby reflecting its willingness to approve wireless structures that do comply with the Comprehensive Plan and Zoning Ordinance. Because further efforts by plaintiffs to design such structures would not be fruitless, Verizon cannot demonstrate a lack of reasonable alternatives.

Therefore, plaintiffs have not carried their "heavy burden" of demonstrating that this particular denial constituted a general prohibition of service, *see Fairfax Cnty.*, 672 F.3d at 268, and have not provided sufficient evidence from which a reasonable juror could find that the Board violated 47 U.S.C. § 332(c)(7)(B)(i)(II). Accordingly, summary judgment will be granted for the Board on Count II.

## III. CONCLUSION

For the reasons stated above, the plaintiffs' Motion for Summary Judgment will be denied and the defendant's Motion for Summary Judgment will be granted by an appropriate Order to be issued with this Memorandum Opinion.